**Roy Clifton INESS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 55612.**

Court of Criminal Appeals of Texas, En Banc.

Sept. 10, 1980.

John W. Cliff, Jr., Odessa, court appointed on appeal, for appellant.

John H. Green, Dist. Atty. and Dennis Cadra, Asst. Dist. Atty., Odessa, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

DOUGLAS, Judge.

Appellant was convicted of rape under the former code, Article 1183, V.A.P.C.

The jury assessed his punishment at twenty-five years.

█ The main contention is that the prosecution suppressed evidence. We hold that the report allegedly suppressed was not exculpatory. There must be a suppression of material evidence according to all of the cases before a case will be reversed. The alleged suppressed evidence was not admissible, material or exculpatory. The dissent would adopt a new test that a reversal may be had when suppressed material " 'may have had an effect on the outcome of the trial.' " It would omit that part of the test which requires that material evidence must be suppressed.

For a better understanding of the case, a detailed statement of facts will be given.

The prosecutrix at the time of the incident was twenty-nine years of age, lived alone and suffered from cerebral palsy and a brain defect which caused brain damage. She had been in special education classes until she dropped out after completing the ninth grade and was employed as a babysitter, housekeeper and bowling alley attendant.

At the time in question, the prosecutrix and a friend, Betty, were walking together to a Sambo's restaurant in Odessa. While enroute the pair was approached by Iness who asked if they would like to get something to drink. After a brief conversation, the prosecutrix agreed to go with him under the mistaken assumption that he was a friend of Betty's. The two then drove to a Pizza Hut where they ate and engaged in light conversation. Upon leaving the restaurant, appellant expressed a desire to go somewhere and just talk. The prosecutrix agreed and Iness drove west out of Odessa. She testified that after they left the Pizza Hut appellant's disposition became vicious, and he began to drink from a whiskey bottle. Appellant pulled into an open field near an oil well and demanded that she get out of the car and sit on the hood. The prosecutrix protested but complied because she was frightened. Once on the hood of the car Iness kissed her. After threatening to kill her, he forced her to disrobe in front of the car headlights and commit oral sodomy upon him. At one point she attempted to escape but was caught by him, beaten and forced to submit to anal and sexual intercourse [1] while positioned behind her, again under threats of death. Failing to achieve sexual satisfaction, he drove the prosecutrix back to Odessa and dropped her off at Betty's apartment complex. David Eades, Betty's boyfriend, was the only person at Betty's apartment when the prosecutrix knocked on the door. He described the event as follows:

"A.   Well, I opened the door and shocking to see there was a woman, her mouth all bloody and nose had been, blood all over her face and mud on her arm and mud all over her black clothes she had on, she was dressed in black that night.

"Q.   Okay.

"A.   And then I didn't really know what to do. Called the police.

"Q.   All right.

"A.   That is what I did.

"Q.   Could you describe her emotional state, was she calm, easy going or not or what?

"A.   No, sir. She was really disturbed.

"Q.   Was she crying?

"A.   Yes, sir.

"Q.   Was she nervous?

"A.   Yes, sir. She, just like, in other words, she was just shaking.

"Q.   All right. Was she, could you state whether or not she seemed hysterical?

"A.   Yes, she was.

"Q.   And did she say what had happened to her?

"A.   Well, she made a statement that I understood her to say she had went had coffee with somebody and they took advantage of her and raped her, all really I know."

1.   V.T.C.A., Penal Code, Section 21.01(3), provides that " 'sexual intercourse' means any penetration of the female sex organ by the male sex organ."

David Eades testified the prosecutrix was hysterical. She gave him the name of her guardian for him to call. When he could not locate the guardian, he called the police.

When counsel for the defense asked to see the statements that the prosecutrix signed that night, the assistant district attorney informed the court that he knew of only one statement that she signed. The statement that counsel for appellant was furnished and which he introduced for his bill of exception is the complaint signed by the prosecutrix and sworn before Justice of the Peace J. A. Purifoy in Ector County.

■ Counsel for appellant, when asking for what Officer Hammack wrote, said he believed that the report contained exculpatory statements. There is no contention that counsel for the defense had not seen the statement before the trial.

The statement also contains the recitation, "When we left the hospital Capt. Scott asked if the attacker forced her from the rear and she advised that was correct. This girl has a mental problem and it is hard to get a message across to her.... She did not know where the rape had taken place but it happened in a field somewhere.... He forced her to get on her knees with her head on the ground. Due to what I can understand from her he forced her to commit sodomy."

These statements in the officer's report are not exculpatory. The very first sentence in the report recites that the prosecutrix told the officer that she was raped from the back. The nurse's statement to the officer that she could have meant the rectum does not rule out rape. The prosecutrix testified that there was penetration in the vagina and in the rectum. Here the witness was a victim of cerebral palsy. She was not articulate. Her condition was such that defense counsel attacked her competency to testify outside the presence of the jury. From the report, it would appear that she told of the sodomy and the rape.

When she made the outcry to Eades, she told him that she had been raped. The report does not show any exculpatory statements.

A copy of the complaint made before Justice of the Peace Purifoy was signed by the prosecutrix. Such statement could have been used by counsel for defense to cross-examine the prosecutrix. The first statement in the complaint is:

"I would like to say that I have good reason to believe and do believe that Roy Clifton Iness did Assualt Me With The Intent to Rape...."

After reciting what happened before and after he parked, the complaint, signed by her, recites:

"He then got around behind me and entered my rectum with his penis & then finished up with his penis in my vagina & this was all done from the back."

The complaint also contained the statement:

"I have been shown Texas Dept. of Corrections picture # 205343, Roy Clifton Iness and also a snapshot of this same person & I have identified him as being the same person who used force threats to make me submitt to his demands of Sodomy.

"I feel that the facts as contained in this affidavit present probable cause on which to base complaint & I respectfully request that a warrant be issued charging Roy Clifton Iness with the offense of assault with the attempt to commit rape a Felony offense under the criminal statutes of the State of Texas."

This complaint or affidavit was sworn to some two or three days after the date of the commission of the offense. It was apparently typed by an officer or under his direction. It contains conclusions that appellant abducted her with intent to commit rape. It also contains statements of fact that his penis penetrated her vagina. It also contains a statement that Iness used force to make her submit to his demands for sodomy.

These statements or conclusions would show assault with intent to commit rape but it does not take out of this statement that he put his penis in her vagina. The conclusion that, after being shown the pho-

tograph that she identified appellant as to the person who used "force threats to make me submitt to his demands of sodomy", does not detract from her recitations of the facts that it was rape.

Counsel for the defense had this complaint and introduced it before the judge. He knew what it contained. He also knew that she was examined at the hospital. He introduced the hospital records with the permission of the court at the penalty stage of the trial.

There is no showing that he did not talk to the nurse who purportedly made the statement to Officer Hammack. There is no showing that he did not talk to Officer Hammack before the trial. There is no showing that he did not talk to Officer Scott who is mentioned in the report. There was more in the complaint than there was in the report which might have been beneficial to appellant.

Taking the evidence of her outcry to Eades that she had been raped and her statement to Officer Hammack that she had been raped and the statements in the complaint that she had been raped and the statements similar to those claimed to be exculpatory, there was no suppression of evidence.

The standard for determining materiality of information withheld from the defense is that of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), where, as in the instant case, the material was specifically requested by the defense. *United States v. Agurs*, 427 U.S. 97, 104, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976).

The dissent misconstrues the *Brady* rule as it applies to documents which are inadmissible at trial. The Supreme Court in *Brady* upheld the Maryland Court of Appeals' decision to remand that case for a new trial limited to the issue of sentencing; at the same time, the Court upheld the state court's affirmance of the finding of guilt on the ground that the exculpatory evidence was inadmissible on the issue of guilt or innocence. 373 U.S. at 90, 83 S.Ct. at 1198. The Court indicated that when the information withheld is not admissible, its

possible effect on the jury's decision is not to be considered:

"A sporting theory of justice might assume that if the suppressed confession had been used at the first trial, the judge's ruling that it was not admissible on the issue of innocence or guilt might have been flouted by the jury just as might have been done if the court had first admitted a confession and then stricken it from the record. [Footnote omitted] But we cannot raise that trial strategy to the dignity of a constitutional right and say that the deprival of this defendant of that sporting chance through the use of a bifurcated trial (cf. *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337) denies him due process or violates the Equal Protection Clause of the Fourteenth Amendment." 373 U.S. at 90–91, 83 S.Ct. at 1198.

The arguably exculpatory material in Hammack's report consists of three statements attributed to the nurse who had examined the complaining witness and the officer's conclusion as to the complainant's story:

"_____ (Prosecutrix) advised that she had been raped from the back and the nurse advised that she could have meant the rectum. . . . At the above time and date I talked with RN Nurse O. Pina and she advised that from the test she had taken from _____ she could say that in her opinion penetration was made in the rectum. . . . She advised that there was no sperm show up in the test. . . . *From what I can understand* from her he forced her to commit sodomy." (Court's Exhibit # 1). (Emphasis supplied).

■ The alleged statements of the nurse are hearsay, and as such, inadmissible. The nurse did not testify at trial, so they could not have been used in impeachment. Hammock's conclusion as to what occurred is not accompanied by any recorded statements of the complaining witness and could not have been used to impeach her testimony at trial. The withholding of inadmissible material does not violate the *Brady* rule.

The dissent indicates that the question of inadmissibility of the withheld report should be subordinated to its general usefulness to the defense counsel.

This position has been rejected as a constitutional requirement by the Supreme Court in *Agurs*, supra:

"It has been argued that the standard should focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial, rather than the materiality of the evidence to the issue of guilt or innocence. See Note, The Prosecutor's Constitutional Duty to Reveal Evidence to the Defense, 74 Yale L.J. 136 (1964). Such a standard would be unacceptable for determining the materiality of what has been generally recognized as *Brady* material for two reasons. First, that standard would necessarily encompass incriminating evidence as well as exculpatory evidence, since knowledge of the prosecution's entire case would always be useful in planning the defense. Second, such an approach would primarily involve an analysis of the adequacy of the notice given to the defendant by the State, and it has always been the Court's view that the notice component of due process refers to the charge rather than the eviden-

tiary support for the charge." 427 U.S. 108 at 112, fn.20, 96 S.Ct. 2399 at 2401 fn. 20 [2].

This Court will not adopt the broader "help in preparation" approach.

The dissent also relies on *Means v. State*, 429 S.W.2d 490 (Tex.Cr.App.1968), and especially that part which reads:

"Reversible error is also committed where the prosecutor negligently or inadvertently fails to disclose evidence which may exonerate the accused or which may be of material importance to the defense, even though not offered as testimony at the trial and even though the accused's counsel is not diligent in his preparation for trial." 429 S.W.2d at 494.

The evidence in question in *Means*, a laboratory report indicating hair found on a murder victim was neither her own nor the defendant's, would have been admissible at trial. The two reasons given by the Court for affirming the conviction of Means apply with equal force to the instant case.

In his opinion in *Means*, Presiding Judge Onion stated that:

"The findings of the unidentified hairs on the body of the deceased may have been consistent with the theory advanced by the defense that someone could have

**2.** The dissent seems to construe the passage in *Agurs* which states that "implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial." 427 U.S. at 104, 96 S.Ct. at 2398, as stating conditions sufficient to show materiality. The holding in *Brady* however, combined with the language of *Brady* and *Agurs* cited supra, indicates that what is implicit is a necessary but not sufficient ground to show materiality.

The dissent states that ". . . the Supreme Court of the United States casts tests for determining constitutional violations in terms 'may have had an effect on the outcome of the trial' or 'in any reasonable likelihood have affected the judgment of the jury', *Napue v. Illinois*, 360 U.S. 264, 271, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217." But the Supreme Court made it clear in *Agurs* that that language applied to situations where, as in *Napue*, perjury known to the prosecutor had gone unchallenged by him.

"In the first situation, typified by *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791, the undisclosed evidence demonstrates that the prosecution's case includes perjured

testimony and that the prosecution knew, or should have known, of the perjury. [footnote omitted] In a series of subsequent cases, the Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, [footnote omitted] and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. [footnote omitted] It is this line of cases on which the Court of Appeals placed primary reliance. In those cases the Court has applied a strict standard of materiality, not just because they involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process. Since this case involves no misconduct, and since there is no reason to question the veracity of any of the prosecution witnesses, the test of materiality followed in the *Mooney* line of cases is not necessarily applicable to this case." 427 U.S. at 103–104, 96 S.Ct. at 2397.

The instant case, like *Agurs*, presents no question of perjury, and the *Mooney–Napue* test of materiality is not applicable here.

possibly entered the hotel room after appellant left, but such findings do not undeniably support the defensive theory in view of the undisputed fact of the deceased's avocation and the fact that the deceased did not meet the appellant until 6:30 p.m. on the day in question, approximately 2 hours prior to the estimated time of her death. *Further, such findings were not inconsistent with prosecution's theory of the case.* 429 S.W.2d at 495 (Emphasis supplied).

In the instant case, Nurse Pina's statement that "[the prosecutrix] could have meant the rectum," and her opinion that penetration was made in the rectum, and Officer Hammack's impression that the prosecutrix had been sodomized all corroborate the prosecutrix' testimony at trial:

"Q. Can you tell us whether or not he tried to put his sexual organ in your rectum?

"A. Yes.

"Q. And did he do that or try that for a while?

"A. About 5 minutes.

   *   *   *

"Q. Can you tell us what ways he was trying to achieve a climax?

"A. Both ways, but he did it from behind.

"Q. Okay. Now, both ways, by that do you mean in the rectum?

"A. And in the other."

Judge Onion's opinion in *Means* found as a separate ground for affirming the conviction that "[w]e cannot conclude that appellant has shown he did not know the results of this test prior to the receipt of the jury verdict." 429 S.W.2d at 495.

The record, in the present case, shows on its face that appellant was aware of the pertinent information in Hammack's report. The negative results of the sperm check were in the examination report whose introduction appellant successfully objected to at the guilt phase of the trial, and which he himself introduced at the punishment phase, was State's Exhibit # 4, Defendant's Exhibit # 3.

Appellant's closing argument makes it clear he was aware that the prosecutrix had been examined by Nurse Pina and that the results of the examination might not have conclusively shown evidence of the occurrence of a rape:

"And the nurse examines her and after all this evening, what comes of it? They give her Valium capsules. . . . Don't you know that a lady who goes to the Emergency Room and there claims to them and has any evidence at all and claims that some man has inserted his penis into her rectum and claims that thereafter has inserted it in her vagina, don't you know that those doctors and that nurse and those people are going to give her the necessary treatment to cleanse her vagina? . . . There was nothing done. Now, the burden of proof is on the State. The burden to bring the witnesses. I assume that those doctors did their job, that the nurse did. . . . Don't you know that if there is sexual intercourse there is invariably evidence of recent sexual intercourse? Two doctors and a nurse and the reason she was taken there was to see if there was anything on earth in the way of evidence. Now, what do we find? Was there anything about her condition, anything the doctors found that said that she needed to be kept in the hospital so much as overnight, so much as for 5 minutes after the examination? No. Those medical people turned her over to these people."

The only statement in the Hammack report, other than Nurse Pina's corroboration of a portion of the prosecutrix' testimony, which is arguably exculpatory is the conclusion of Officer Hammack that the prosecutrix had been sodomized. Appellant's cross–examination of the prosecutrix tried to establish that sodomy was the only act committed:

"Q. All right. And the truth is he never tried, he never did have intercourse with you by putting his penis or private part in your . . .

————, the truth of the matter is that while he hurt you and hit you and did all those things to you, he was the

kind of a person that screwed you in the ass, didn't he?

"A. No.

"Q. What did he do?

"A. As I told the attorney a while ago just exactly what I told the attorney, that is exactly what happened.

"Q. All right. He never did have intercourse with you by putting his peter or penis or prick in your pussy, did he?

"MR. CADRA: Judge, I object to the language here. She does not use those terms and I believe there are proper terms for this.

"THE COURT: I will overrule your objection as long as she, I think first you will have to establish what you are talking about.

"Q. All right. What do you mean when you say your vagina, what are you talking about?

"A. Entered the front.

"Q. What?

"A. Entered the front, but he did it behind both times, as I said before.

"Q. He did it behind both times, didn't he?

"A. Yes, Yes.

"Q. Which means, and you are telling the jury that that is your rectum, that is what happened, isn't it?

"A. No.

"Q. Tell us what did happen.

"A. Just like I told the attorney, the other attorney a while ago, just exactly what happened. He had me to kneel down on my knees, he demanded me to kneel down upon my knees.

"Q. Yes?

"A. And he told me if I didn't do it he would hit me again or he would kill me. He kept threatening me and that is exactly what happened, just like I told the attorney, the other attorney a while ago.

"Q. And he put in behind [sic], meaning your rectum, didn't he?

"A. And the other too.

"Q. He never did put it in your vagina or in the front, did he? You have never claimed that, have you?

"MR. CADRA: Judge, he is misstating her testimony to her. She just claimed that.

"THE COURT: Let her answer the question. Answer the question, Ma'am.

"A. Would you repeat your question?

"Q. I say he made you, he forced you and he scared you and he frightened you and he put it in as you told us behind.

"A. And in front, it can be done both ways, from the, from the behind.

"Q. All right.

"A. And that is what I told the other attorney and that is the truth.

"Q. You now say that after he had put it in behind he put it in your vagina, is that what you are telling the jury under oath?

"A. I'm just telling what had actually happened, just like I told the other attorney."

Appellant thoroughly aired the issue of whether vaginal penetration had been made. The inadmissible conclusion of Officer Hammack that the prosecutrix had been sodomized could have added nothing to appellant's case. The jury was entitled to find from the testimony that a rape had occurred, and it did so find. The report of what the nurse said contained no more than what defense counsel already had. The report was not admissible, it was not material and it contained no exculpatory evidence. This Court will not adopt a sporting theory of justice as condemned by the Supreme Court of the United States in the *Brady* case, supra. We will follow the cases of this Court and the Supreme Court of the United States and require that there must be material evidence suppressed to require a reversal instead of following some theory that defense counsel might think would be helpful to him even though what has been suppressed is not material, not admissible

and would not likely change the result of the case.

■ Next, appellant argues that the court erred in failing to grant a mistrial when the prosecutor remarked: "We have no more witnesses and with the exception of the medical records which were not admitted, we will rest our case in chief."

After the statement was made the court sustained appellant's objection and properly admonished the jury. This was sufficient to render the error harmless.

Complaint is made of the trial court's decision to allow the jury to rehear the testimony of the prosecutrix regarding actual penetration. During deliberations the jury sent out a note asking to hear the testimony over. The court properly instructed them that they must certify their disagreement and request only that part of a witness' testimony which was in dispute. The jury then sent out the following note:

"At the beginning of where Mrs. _____ (the prosecutrix) was being questioned by the D.A. about actual penetration. We are in disagreement *as to her answers concerning this matter.*" (Emphasis supplied).

The trial judge determined that the jury was in disagreement regarding the prosecutrix' testimony on penetration and allowed the jury to hear the direct and cross-examination of her which related only to penetration. Appellant contends the testimony reheard should have been limited to the direct examination by the State, and so objected at trial.

■ It is well settled that the trial court may allow a disputed portion of a witness' testimony to be read to the jury and refuse additional testimony. Article 36.28, V.A.C. C.P.; *Nichols v. State*, 494 S.W.2d 830 (Tex. Cr.App.1973); *Johnson v. State*, 494 S.W.2d 765 (Tex.Cr.App.1969).

■ When the jury asks that certain disputed testimony be re-read, the court must first determine if the request is proper under Article 36.28, supra. If it is proper, the court must then interpret the communication; decide, in its discretion, what sections of the testimony will best answer the query, and limit the testimony accordingly. See *Bonsal v. State*, 502 S.W.2d 813 (Tex.Cr. App.1973); *Swidell v. State*, 491 S.W.2d 400 (Tex.Cr.App.1973); *Duncan v. State*, 454 S.W.2d 736 (Tex.Cr.App.1970); *Alvear v. State*, 341 S.W.2d 426 (Tex.Cr.App.1960).

■ In the instant case the jury's request stated that they were in disagreement concerning the penetration testimony of the witness. Although the note mentioned the direct examination by the State, the court did not abuse its discretion in interpreting the sentence "we are in disagreement concerning this matter" as an expression of disagreement concerning the prosecutrix' entire testimony relating to penetration. This was later borne out by another request to have a second reading of the appellant's cross-examination of her.

Appellant relies on *Pugh v. State*, 376 S.W.2d 760 (Tex.Cr.App.1964). In *Pugh*, however, the jury merely requested the date and time of the incident. After these were provided, the court on its own motion, ordered all of the testimony of the arresting officer to be read, none of which related to the time and date of the incident. This was held to be an abuse of discretion. Here, the court properly limited the testimony to the portion which related to penetration and, therefore, did not abuse its discretion.

Complaint is made that error was committed when the court allowed a second reading of appellant's cross-examination of the prosecutrix.

The record does not reflect, however, that this portion was re-read. After the note reached the judge the following exchange occurred:

"THE COURT: I think after I read to them I'm going to let them have about 15 minutes and I'm going to send them home.

"MR. CADRA: You can't send them home. (Discussion held off the record.)

"THE COURT: Get the jury in. (The following is in the presence and hearing of the jury.)

"THE COURT: I understand they said they were just about through maybe. Are you just about through?

"FOREMAN: We would like to take another vote.

"THE COURT: All right. That will be fine. (The jury continued deliberations.)

"THE COURT: Get the jury. (The jury is returned to the courtroom and the following is in their presence and hearing.)

"THE COURT: Ladies and gentlemen of the jury, have you reached a verdict?

"JURY FOREMAN: We have."

The record being silent, nothing is presented for review.

■ Next, appellant contends the court erred in failing to grant a mistrial after a conversation between the court and a juror regarding the sudden illness of the juror's mother. He relies on Article 40.03(7), V.A.C.C.P., which states:

"New trials, in cases of felony, shall be granted the defendant for the following causes, and for no other:

"* * *

"(7) Where the jury, after having retired to deliberate upon a case, has received other evidence; or where a juror has conversed with any person in regard to *the case*; . . ." (Emphasis added)

The discussion complained of did not relate to "the case." We have interpreted Article 36.22,[3] V.A.C.C.P., as requiring the defendant to show harm or injury in all cases where a juror speaks to anyone during the court of the trial. *Wilkes v. State*, 566 S.W.2d 299 (Tex.Cr.App.1978); *Young v. State*, 547 S.W.2d 23 (Tex.Cr.App.1977); *Maldonado v. State*, 507 S.W.2d 206 (Tex. Cr.App.1974). The conversation in question did not relate to the case nor was there any harm shown.

■ Finally, appellant claims error occurred when the trial judge refused to

charge the jury at the penalty stage as to the punishment range for rape, V.T.C.A., Penal Code, Section 21.02, as well as aggravated rape, V.T.C.A., Penal Code, Section 21.03, which was the only instruction given. Appellant timely objected to this at trial.

Appellant here, although tried for an offense under the former penal code, elected to be sentenced under the present penal code, pursuant to Acts 1973, Chapter 399, Section 6(c), V.T.C.A., Penal Code, Savings Provision.

In *Casey v. State*, 527 S.W.2d 882 (Tex. Cr.App.1975), the defendant was convicted of robbery by firearms under the former code but elected to be punished under the present one. He complained on appeal that the court refused to instruct the jury on the punishment range for robbery as well as aggravated robbery. The Court stated:

"From the proof adduced during the guilt and punishment stages of the trial, the judge determines the applicable section, or sections (with appropriate instructions if the proof requires giving the jury a choice) of the new code and so charges the jury. By his election to be punished under the new code, a defendant agrees to such a method. The question then is whether the proof substantiates the judge's determination. *Ambers v. State*, 527 S.W.2d 855 (Tex.Cr.App. 1975). See *Wright v. State*, 527 S.W.2d 859 (Tex.Cr.App.1975), and *Jones v. State*, 502 S.W.2d 771 (Tex.Cr.App.1973)."

In the case at bar, the prosecutrix repeatedly testified to threats of death made by appellant to secure her submission. There was no suggestion that the offense would have been only rape under V.T.C.A., Penal Code, Section 21.02. The proof was sufficient to justify the trial judge's submission of the range of punishment for aggravated rape.

The appellant has shown no harm or reversible error. The judgment is affirmed.

---

3. Article 36.22, V.A.C.C.P., provides:

"No person shall be permitted to be with a jury while it is deliberating. No person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court."

TOM G. DAVIS, Judge, dissenting.

Appellant contends that the trial court's refusal to provide him with a police report relating to an interview with the complaining witness on the night of the offense was error. He maintains that he was entitled to see the report under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This contention requires a review of the evidence.

The complaining witness testified that she was picked up on the street by the appellant and taken to eat at a local restaurant. When they left the restaurant the appellant drove out of town and ultimately down an unpaved secondary road. He forced the complaining witness out of his car and to disrobe. He then made her perform oral sodomy upon him under threat of death. The woman then attempted to run away, but was caught and struck in the face. Appellant then brought her back to the front of the car where he forced her to submit to anal intercourse. The victim's responses to questioning regarding whether penetration of her vagina occurred were muddled.[1]

When asked whether "regular intercourse" was performed, she replied that the appellant mostly "did it from behind." When again asked if penetration of her vagina occurred, she answered, "I am not certain really, I believe." The prosecutor again questioned her regarding penetration as follows:

"Q. Okay. Now, both ways, by that do you mean in the rectum?

"A. And in the other.

"Q. Is that in your vagina?

"A. Uh–huh.

"Q. He did it from behind?

"A. Yes.

"Q. And not from in front?

"A. Right.

"Q. But it was in your vagina also?

"A. Yes, I'm sure he tried to, you know, to get in the vagina, but–

"Q. Did he–

"MR. BURNETT [defense counsel]: Don't interrupt, she said but.

"THE COURT: Finish that, please, Ma'am.

"MR. BURNETT: She said he tried in the vagina but, but what, please?

"A. I didn't mean to say the word but. Both ways.

"Q. Well.

"A. Repeat the question.

"Q. I don't know what is going on. He didn't reach a climax as you recall, or do you recall?

"A. He didn't.

"Q. You know? Did his sexual organ pass the outside of your vagina when you said he was trying? In other words you mentioned a moment ago both ways.

"A. Yes. He tried both ways.

"Q. Okay. And did he put it in?

"A. Yeah, in from behind. Yeah.

"Q. In your vagina?

"A. Yes. I mean yes."

A friend of the victim testified that she had come to his apartment on the night of the offense about 2:00 a.m. and stated that she had been raped.

Cross-examination of the witness failed to change her testimony from that above. It did reveal, however, that the victim had made and signed a statement at the sheriff's office on the night of the offense.

Defense counsel then tendered into evidence for the purposes of a bill of exception a statement of the victim that the prosecutor had given him. This statement is dated two days after the offense. Defense counsel then asked for the statement made on the night of the offense. The prosecutor responded that he knew of no such statement, and that the only written material he possessed regarding any statements made that night was a police report.

---

1. The victim suffered from cerebral palsy and a birth defect which caused brain damage. Her education ended at the ninth grade.

The complaining witness was then taken on voir dire where she again stated that she made and signed a statement on the night of the offense, but could not recall if she had made any statement subsequent to that date. She did feel that Deputy Eaton would remember, however. Deputy Eaton was then called to testify.

Deputy Eaton's testimony established that a Deputy Hammack had talked with the victim on the night of the offense and made a report. Eaton was then sent to the sheriff's office to get the report. This report was marked as Court's Exhibit No. 1. It was established that Hammack had left the employment of the sheriff's department about a month after the date of the offense. Deputy Eaton did not know the whereabouts of Hammack at the time of the trial.

Defense counsel then made a motion that he be allowed to examine Court's Exhibit No. 1, maintaining that statements contained therein would be exculpatory as to the appellant.[2] This motion was overruled, but a copy of the report was sealed and forwarded to this Court along with the records of this case.

In *Holloway v. State*, 525 S.W.2d 165, it was stated:

"Police reports generally are not subject to pre–trial discovery, and the State is not required to exhibit them to the defendant prior to the officer taking the stand. See Article 39.14, Vernon's Ann. C.C.P.; *Gutierrez v. State*, Tex.Cr.App., 502 S.W.2d 746; *Bradshaw v. State*, Tex. Cr.App., 482 S.W.2d 233. However, if the facts reflect that the prosecutor actively or negligently suppresses or fails to disclose evidence which may exonerate the accused or be of material importance to the defense, reversible error is committed. *Crutcher v. State*, Tex.Cr.App., 481 S.W.2d 113 and authorities cited."

The sealed police report which is before us lists the offense as "Rape," recites the victim's name as complainant, her address, a "Serial No.," the date of the offense, a

time approximately three hours after the offense, and Hammack's name. This portion of the report is slightly over one page and reads as follows:

"At the above time and date I was advised by 0-5 that the City P.D. was bringing a girl to the S.O. that had been taken into the County and raped. When I got to the office the girl S＿＿＿＿ H＿＿＿＿ was in the radio room. I then took the girl to my office where I talked with her for a few minutes. She had blood on her face and arms which she advised was from a bloody nose that the attacker had given to her. I then took her into the I.D. room and took three pictures of her.

"I then took her to the hospital where R.N. Nurse O. Pina Examined the [sic] her and advised that the results of the test would be advised by Dr. William Brantley. The nurse did advise that she had several bruises on the back and hips. S＿＿＿＿ did advised [sic] that she was raped from the back and the nurse advised that she could have meant the rectum.

"When we left the hospital Capt. Scott asked S＿＿＿＿ if the attacker had forced her from the rear and she advised that that was correct. This girl has a mental problem and it is hard to get a message across to her.

"We then came to the office where I was to take the statement from her. She did not know where the rape had taken place but that it happened in a field somewhere. See statement.

"She advised that the subject that picked her up gave that name of Roy Franklin. She advised that she met this subject while walking to Samboos [sic] with a friend by the name of B＿＿＿＿ C＿＿＿＿. She advised that this subject had stoped [sic] and was talking with B＿＿＿＿ and she thought that they were friends she advised that she could not hear what they were talking about due to the fact she

2. Defense counsel also made a motion for continuance as to gain Hammack's attendance at trial. This too was denied.

was standing behind them. She advised that B._____ told this subjet [sic] that she had to go to work and he then asked if she wanted to go get a piza [sic]. Due to the fact that she thought this was a friend of B._____'s it would be O.K. she advised that she would like that.

"They then went to the Piza [sic] Hut on 42nd st. where she ate a piza [sic]. She advised that they then went ridding [sic] around. She advised that he would stop the car at every gate to check and see if it was locked or not. He advised her that he wanted to find a place where they could talk.

"She advised that the car was a blue mustang with blue seat covers and it had bucket seats. Some where she got the lincense [sic] number DCG 670.

"After he had found a gate that was opened he parked the car and forced her to set [sic] on the hood of the car. He then forced her to take her clothes off with the headlights shinning [sic] on her. Then he forced her to lay down on his pants that he had but [sic] on the ground. He forced her to get on her knees with her head on the ground. Due to what I can understand from her he forced her to committ [sic] sodomy."

The third page of the police report is dated 11:00 p. m. of the same day and summarizes a conversation in which nurse O. Pina, who assisted in the examination of the victim, gave the following information to the officer:

"At the above time and date I talked with R. N. Nurse O. Pina and she advised that from the test she had taken from S._____ H._____ she could say in her opinion peneration [sic] was made in the rectum. She advised that there was a lot of blood. She advised that there was no sperm show up in the test. She also advised that there were several bruises on the back and hips. She also advised that X–rays did not show any broken bones."

The officer's report regarding his interview with the victim some three hours after the offense sets out details that would con-

stitute only the offense of sodomy rather than rape. This tends to support the appellant's position that no penetration of the vagina occurred. The later report regarding information received from the nurse would also tend to show that only sodomy had been committed. Since the appellant's defense was to show that no penetration had occurred, the importance that this information could have had is emphasized by the communications between the judge and the jury during the jury's deliberations.

In Court's Exhibit (Ct. Ex.) No. 2, the jury asked to hear the testimony over. Ct. Ex. No. 3 instructed the jury that they could be read only the part of the testimony that was in dispute.

Ct. Ex. No. 4 contained the following communications from the jury:

"At the beginning of where [the victim] was being questioned by the DA about actual penetration. We are in disagreement as to her answers concerning this matter.

/s/ Foreman"

In Ct. Ex. No. 5 the jury stated that they needed a break. The jury then asked to hear the cross examination of the victim in Ct. Ex. No. 6.

Ct. Ex. No. 7 reflects the state of jury deliberations as follows:

"We feel this 12 people can never agree. What do we do?

/s/ Foreman"

Ct. Ex. Nos. 8 and 8a asked the following questions:

"Could I please talk to the Judge.

/s/ Foreman"

"What happens if we never come to a unanimous agreement.

/s/ Foreman"

The court answered that he could not converse with the jury.

Suppression by the prosecutor of evidence favorable to the accused violates due process where the evidence is material to guilt or punishment. *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Frank v.*

*State*, Tex.Cr.App., 558 S.W.2d 12; *Ransonette v. State*, Tex.Cr.App., 550 S.W.2d 36.

In *United States v. Agurs* supra, the Supreme Court set out three different general situations in which a prosecutor failed to disclose exculpatory evidence and the standard of review which would apply in each. The first situation was where the prosecutor's case included what he knew or should have known was perjured testimony. The Supreme Court cited *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), as typical of this situation. 427 U.S. at 103, 96 S.Ct. at 2397. The standard applied in *Mooney* was that the conviction must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." 427 U.S. at 103, 96 S.Ct. at 2397.

The second situation was that found in *Brady v. Maryland*, supra. In *Brady*, a request had been made for the exculpatory evidence and it had been withheld from the defendant. The test in this situation is whether the evidence was material on guilt or punishment in that it might have had an effect on the outcome of the trial. 427 U.S. at 106, 96 S.Ct. at 2398; *Smith v. State*, supra.

The final situation was that presented in *United States v. Agurs*, supra. In *Agurs*, no request for the evidence had been made, nor was the prosecutor knowingly allowing perjured testimony to be entered at trial. The undisclosed information in *Agurs* was the deceased's criminal record which showed convictions for assault and carrying a deadly weapon. The defendant argued that this tended to support a theory of self–defense and thus the prosecutor should have disclosed this information. The Supreme Court held in *Agurs* that unless the undisclosed evidence creates a reasonable doubt of guilt that did not otherwise exist, no reversal would result. 427 U.S. at 112 13, 96 S.Ct. at 2401–2402.

The present case squarely falls into the second situation, characterized as the *Brady* situation. Thus the standard of review is whether the undisclosed information may have had an effect on the outcome of the trial. *Ransonette v. State*, supra; *Smith v. State*, Tex.Cr.App., 516 S.W.2d 415. In *Ransonette,* this Court found that the key elements under this standard of review are:

"(a) suppression of evidence by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence. *Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972)."

We find that the facts in the present case establish all three of these criteria. A proper request was made by defense counsel when the materiality of this evidence became known to him. The evidence would have been favorable to the defense in that it tended to show that no penetration of the vagina occurred. Finally, notes from the jury and the substance of the complaining witness' testimony reveal that penetration was a highly contested issue in the case, and as such was of material importance to the defense.

In *Means v. State*, 429 S.W.2d 490, this Court considered the suppression of the results of a test that showed the presence of hair on the deceased that belonged to neither her nor the defendant. Defendant had refused to submit to the taking of a sample of hair until 5:30 p.m. on January 26. At noon on the 27th, defense counsel conferred with the prosecutor and inquired as to the results. The prosecutor did not know of any results, but said he would check. Later on the afternoon of the 27th, the State was told that the hairs matched neither the deceased nor the appellant's hair. The State called one more witness and rested, without disclosing the evidence.

A newspaper carried the results of the test in its last January 27th edition. Defense counsel admitted having read the results in the newspaper, but did not state when. The jury deliberated from 4:00 p.m. on the 27th to 11:10 a.m. on the 28th.

This Court held that the findings of the test were not inconsistent with the prosecutor's case.

The Court further stated:

"We cannot conclude that the evidence allegedly suppressed would have materially affected the determination of appellant's guilt or the punishment to be imposed and that the failure to disclose such evidence, under the circumstances here presented, was so prejudicial as to warrant a reversal on the basis of denial of due process."

Further, the Court observed:

"It appears that prior to the receipt of the jury's verdict that the results of the test by virtue of the newspaper coverage was a matter of some public knowledge in Harris County and if having learned of such test the appellant could have moved the court to allow him to reopen in order to introduce other testimony. See Article 36.16, V.A.C.C.P. We find no evidence in the record that the appellant made such request.

\* \* \* \* \* \*

"Therefore, even if we were to conclude that the actions of the State's attorney constituted suppression of the evidence, which may have had an effect on the outcome of the trial, still reversible error is not shown in view of the fact that appellant has failed to show that he did not know the results of the test involved before the receipt of the jury verdict at this one stage trial."

In the instant case, unlike *Means*, there is no showing that defense counsel knew of the undisclosed information. In *Means*, defense counsel knew of the tests, knew of the results (although when is not clear), could have discovered the results, and, moreover, the evidence was not inconsistent with the State's theory of the case.

Under *Means'* facts, there could be a duty to show that defense counsel did not know the results of the test before the end of the trial *because of defense counsel's admission that he had learned of the results from another source.* But *Means* does not hold that there is no error unless appellant makes an affirmative showing that he had no knowledge of the facts in the suppressed report. How would it ever be possible to negate knowledge of facts contained in a report that the trial court refuses to allow the appellant access to?

It is true that the victim testified to facts which showed that the offense of sodomy had been committed on her. The police officer's report which set forth the results of an interview with the victim and the nurse who examined her relates facts consistent with the offense of sodomy having been committed, but details no acts or results of the examination which would tend to show that the victim was raped.

While details in the report relating to the offense of sodomy are not inconsistent with the victim's testimony, it must be remembered that the appellant was being tried for the offense of rape. I deem it significant that the report made on the day of the offense sets forth no facts relating to the offense of rape. Under such circumstances, I cannot conclude that the undisclosed information contained in the report would not have been so beneficial to appellant as to have had an effect on the outcome of the trial.

I would hold that the suppression of the police report after the appellant's request for same was reversible error in light of the testimony and issues present in the trial.

I dissent.

CLINTON, Judge, dissenting.

Disagreeing with the analysis, findings and conclusions and the judgment of the Court, I would be content to join the opinion of Judge Tom Davis without writing separately on the issue, but for the approach taken by and tenor of the majority opinion and one subsidiary aspect of his dissenting opinion.

To begin with, the majority has not even correctly identified what issue is actually before the Court. Wide the mark is its opening statement, "The main contention is that the prosecution suppressed evidence." As shall be shown, the prosecuting attorney expressly disclaimed possession, and implicitly then any knowledge, of any statement other than the one he had furnished counsel for appellant. The real contention is that

once existence the writing in question became known to all appellant was entitled to examine and utilize it appropriately.

The principal factual issue in the case was whether the vagina of the prosecutrix was penetrated by the penis of appellant. It was first presented by her testimony in response to understandably somewhat leading questions from the prosecutor:

"Q: Okay. Now, did he try to perform a sex act from behind you?

A: Yes.

\* \* \* \* \* \*

Q: Okay. Did he first, can you tell us whether or not he tried to put his sexual organ in your rectum?

A: Yes.

Q: And did he do that or try that for a while?

A: About 5 minutes.

Q: Did he later on, can you tell us whether or not he penetrated your vagina with his sexual organ afterwards, in other words did he do regular intercourse afterwards in that same position?

A: I would say he mostly, you know, did it from behind.

\* \* \* \* \* \*

Q: Now, before you all were through there at the car did he go in your vagina, in your sexual organ after he had gone into your rectum?

A: I am not certain really, I believe.

Q: What do you mean?

A: I couldn't say for sure, but I know he did go from behind."

Leaving the matter of penetration in a plainly uncertain state, the prosecutor went on to other subjects and then returned to the issue. After a few more questions about trying to achieve a climax "both ways," the State drew from the prosecutrix the following:

"Q: You know? Did his sexual organ pass the outside of your vagina when you said he was trying? In other words you mentioned a moment ago both ways.

A: Yes. He tried both ways.

Q: Okay. And did he put it in?

A: Yeah, in from behind. Yeah.

Q: In your vagina?

A: Yes. I mean yes."

On cross–examination, after getting the spelling of her married name, appellant revisited the matter of penetration:

"Q: . . . while you were testifying you once said that you could not be sure that he penetrated or entered or went into your vagina that night. Do you remember saying that today?

A: Yes.

Q: That is the truth of the matter, isn't it?

A: Yes."

Further questioning drew answers that are set forth in the majority opinion, and need not be reiterated here. Clearly they show an other than lucid effort to claim penetration of the vagina. In its entirety, the ambiguity of her testimony on the issue of penetration may be considered by reasonable persons as a consequence of her difficulty in communication, her shyness in speaking more graphically or, indeed, a reflection on her credibility and, perforce, the reliability of her account.

It was shown that the prosecutrix was taken to a hospital for examination and treatment. Appellant inquired whether she stated at the hospital "that his private part had gone in your vagina" and she responded that they had asked her questions. Asked if she told them that "it had," her response was: "I told them exactly what happened. I just answered the questions directly." Whereupon, at appellant's request, the court excused the jury and permitted a voir dire examination concerning statements that the prosecutrix may have given, which drew from her that shortly after returning from the hospital she made a statement at the sheriff's office, believing it was "the same night." With that, appellant presented for his bill of exception a written statement made by prosecutrix some three days

after the offense and called on the State to produce and deliver the statement made by prosecutrix on the night of the offense. The State insisted that the one it had just delivered to appellant was the only statement in its possession. The prosecutrix testified that she did not recall whether she made one or two statements but she was sure that Deputy Bob Eaton would know. Whereupon Deputy Eaton was called as a witness by appellant and it was revealed that then Deputy Roger Hammack was the one who had talked to the prosecutrix and had made a report. With the permission of the court Eaton retrieved from files in the sheriff's office the Hammack report.[1] The deputy agreed that the report was a summary of conversations with the first officer who talked to prosecutrix in the sheriff's office and that it stated what she had to say to him and what she claimed had happened to her. The State protested that what started out as a hearing to determine whether or not there were two signed statements made by prosecutrix had turned into an effort to discover everything in the files of the sheriff and of the State, which should be then and there halted because appellant "is not entitled to that kind of discovery under any circumstances." The court then had a copy of the report made, identified it as Court's Exhibit 1, heard sufficient testimony to authenticate it, denied a motion that appellant be permitted to examine its contents and sealed the exhibit in an envelope that is a part of the record on appeal.[2]

The three page report is actually two accounts: one by Deputy Hammack bearing the date and time, 2:15 a. m., when he was first advised of the offense, that relates his actions in observing the accused in the sheriff's office, taking her to the hospital, talking to nurses and doctors, returning to his office and getting the report from prosecutrix that is there set forth; the second is a summary of a conversation had with a nurse at the hospital at 11:00 p. m. on the same day. Omitting matters not germane to our issue, the first account includes a conversation with the examining nurse who said that prosecutrix had advised "that she was raped from the back" which the nurse believed that "she could have meant the rectum." An officer accompanying Hammack is reported to have asked prosecutrix "if the attacker had forced her from the rear and she advised that that was correct." As to the second conversation with the examining nurse, the Hammack report reflected "that in her opinion penetration was made in the rectum" and that sperm did not show up in the tests that were made.

By his first ground of error appellant contends that the trial court erred in refusing to permit him to examine and use the Hammack report. I agree.

*Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) extended *Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 342, 79 L.Ed. 791 (1935) and *Pyle v. Kansas*, 317 U.S. 213, 215 216, 63 S.Ct. 177, 178, 87 L.Ed. 214 (1942) to hold:

"... the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the

---

1. Apparently the Hammack report was not maintained in a file identifiable by the name of the prosecutrix. Deputy Eaton testified, "It is in a folder along with probably 15 or 20 other cases. That is the way we file them."

2. I have developed at some length the manner in which the Hammack report came to light in order to demonstrate the fortuity by which its existence became known. Thus, the deputy who made it had long since left his employment and his whereabouts were not known to Deputy Eaton; the report was maintained in a file along with a number of other cases; the prosecuting attorney apparently did not have a copy of it for Eaton had to leave the witness stand and obtain it from his office; the prosecutor insisted the report was not discoverable. On the other hand, there is not the slightest suggestion that appellant was aware of its existence: There were no pre-trial discovery motions; the one statement of the prosecutrix was tendered to appellant during his voir dire examination of the prosecutrix; it was her volunteered remark that Deputy Eaton might know of a second statement which led to Eaton and, in turn, to the Hammack report. In these circumstances we do not have a situation remotely comparable to *Means v. State*, 429 S.W.2d 490, 496 (Tex.Cr.App. 1968) and reliance on it by the majority opinion is misplaced.

evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution."

In *Means v. State*, 429 S.W.2d 490, 493–495 (Tex.Cr.App. 1968), after carefully collecting and studiously analyzing the authorities, Presiding Judge Onion, writing for the Court, perceived certain emerging "guidelines and rules," one of which he expressed as follows:

> "Reversible error is also committed where the prosecutor negligently or inadvertently fails to disclose evidence which may exonerate the accused or which may be of material importance to the defense, even though not offered as testimony at the trial and even though the accused's counsel is not diligent in his preparation for trial."

Four years later interim developments were canvassed by the Court in *Crutcher v. State*, 481 S.W.2d 113 (Tex.Cr.App. 1972), again through Presiding Judge Onion writing for a unanimous Court. Reversing the judgment of conviction because an offense report containing a description of the offender given by an eyewitness, which description was inconsistent with the trial testimony of that witness, was not made available to the accused, the Court noted the discussion of the general rule in and quoted from *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972), as pertinent here:

> "... When the 'reliability of a given witness may well be determinative of guilt or innocence,' non–disclosure of evidence affecting credibility falls within this general rule ... We do not, however, automatically require a new trial whenever 'the combing of the prosecutor's files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict ...' .... A finding of materiality of the evidence is required under *Brady, su-*

*pra*, [373 U.S.] at 87, 83 S.Ct. at 1190, 10 L.Ed.2d 215. A new trial is required if the 'false testimony could ... in any reasonably likelihood have affected the judgment of the jury ...' *Napue v. Illinois, supra*, [360 U.S.] at 271, 79 S.Ct. at 1178, 3 L.Ed.2d 1217."

Accordingly, the standard applied by *Crutcher* to the prior report of the eyewitness giving a description of the offender was whether it "may have had an affect on the outcome of the trial." Here the testimony does not come from a witness but the complaining party herself. The report at issue was an account of statements she had made shortly after the offense had been perpetrated.

More recently the Supreme Court categorized the rule of *Brady v. Maryland*, supra, into at least "three quite different situations," *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976).[3] One of the situations is, of course, *Brady* itself. Its rationale is that withholding evidence on demand of an accused "which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant" and make it "a proceeding that does not comport with standards of justice" even though suppression is not "the result of guile." *Brady*, supra, 373 U.S. at 88, 83 S.Ct. at 1197. As *Agurs* points out, the holding in *Brady* was that suppression of the statement deprived him of due process, "noting specifically that the statement had been requested and that it was 'material' ... (and) ... implicit in the requirement of materiality is a concern that the suppressed evidence *might have* affected the outcome of the trial," 427 U.S. at 104, 96 S.Ct. at 2398.[4]

In *Smith v. State*, 516 S.W.2d 415 (Tex. Cr.App. 1974) the Court applied the *Brady* ·standard to determine whether an offense

---

**3.** Strictly speaking each category involves post–trial discovery of information unknown to the defense before or during trial. Here, of course, the Hammack report became known during trial and was "suppressed" only by the adverse ruling of the trial court. But for ana-

lytical purposes the somewhat different "set" is less significant than the policies that are implicated by failure to disclose.

**4.** All emphasis is added by the writer of this opinion unless otherwise indicated.

report which included a description of the robber given by the complaining witness was erroneously withheld from the accused by the trial court at the end of a discovery hearing that was held during the course of the trial.[5]

But unlike *Smith*, and in line with *Crutcher*, supra, 481 S.W.2d at 116–117, I believe that, penetration being an important issue in the case, the credibility and reliability of the complaining witness was obviously of utmost significance and knowledge and use of the contents of the Hammack report might well have exonerated appellant, but certainly might have affected the outcome of the trial.[6]

When the Supreme Court of the United States casts tests for determining constitutional violations in terms of "may have had an effect on the outcome of the trial" or "in any reasonable likelihood have affected the judgment of the jury," *Napue v. Illinois*, 360 U.S. 264, 271, 79 S.Ct. 1173, 1178, 3 L.Ed.2d 1217 (1959), it means that the practice under consideration is "inherently suspect" so that actual prejudice to the accused need not be found. See *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1964); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) and *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). So in a situation that invokes the rule of *Brady v. Maryland*, or its progeny, a reviewing court performs its duty in determining whether the "inherently suspect" practice could "in any reasonable likelihood" have affected the judgment of the

jury or the outcome of the trial. Accordingly, I do not devote the attention given to messages to the trial court from the jury and the significance attached to them by the dissenting opinion of Judge Tom Davis. I believe the test applicable here for the conclusion he reaches is met without regard to the matter of jury communications.

On the other hand, the majority opinion does not squarely address the test. Rather it insists that denial of the Hammack report may be upheld on the basis of one or another different theory: First, that the holding in *Means v. State*, 429 S.W.2d 490 (Tex.Cr. App. 1968) has not been followed—a contention satisfactorily disposed of, in my view, by Judge Tom Davis in his opinion—and, second, that its examination and construction of the report at issue show it was not exculpatory. I cannot accept the manner in which the majority opinion develops the second theory. *Brady*, supra, teaches that a reviewing court seeks to determine whether the evidence is "material either to guilt or to punishment" and *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 765, 766, 31 L.Ed.2d 104 (1972), the updated basis of *Crutcher*, supra, holds that since reliability of a given witness may well be determinative of guilt or innocence, evidence affecting credibility *is* material and within the *Brady* rule. In a case like the one before us, then we perform our duty as a reviewing court by looking to the undisclosed writing against a backdrop of testimony to determine if the writing affects reliability of a witness's testimony bearing strongly on the issue of guilt. It is not, and should not be, the function of an appellate court to go

5. This situation is distinguishable from the one in *Frank v. State*, 558 S.W.2d 12 (Tex.Cr.App. 1977) which follows the teaching of *Agurs* in the third situation, different from *Brady* itself, typified by *Agurs*–whether in the absence of a specific request the prosecutor has any constitutional duty to volunteer exculpatory matter to the defense and, if so, what standard of materiality gives rise to that duty. So also *Ransonette v. State*, 550 S.W.2d 36 (Tex.Cr. App. 1976).

*Smith* concluded that knowledge of the particular description would not have exonerated the accused or have affected the outcome of his trial.

6. In moving for permission to examine and use the report, appellant asserted several reasons: First, as Deputy Eaton had already testified, that the report contained statements made by the prosecutrix to the first law enforcement officer to talk with her following the claimed sexual assault so that, secondly, the statements would be exculpatory or, three, tend to subtract from the credibility of the prosecutrix in the eyes of the jury or, fourth and alternatively, would be relevant to and beneficially persuasive on the question of punishment.

beyond an examination for materiality into the realm of fact finding, for that is exclusively the province of the jury in this case. Yet, the majority opinion engages in extreme exercises of semantical gymnastics to derive meanings from this word or that phrase in its endeavors to characterize the report as not exculpatory. Such as exercise, once a finding of materiality has been made by a reviewing court, is the prerogative of the fact finder on a new trial and this Court is well advised to avoid the rigors.[7]

Because ground of error one is not sustained, and judgment of conviction reversed and the cause remanded, I dissent.

ROBERTS and PHILLIPS, JJ., join.

---

**7.** In its scattershot the majority opines that the report in hands of counsel for appellant could not have been used to impeach testimony of the prosecutrix at trial, thereby implying that the defense could not utilize the report for whatever value counsel thought it may have. How and when the report might be offered and in what fashion it might be used is another exercise that this Court should leave to the regimen of counsel for the accused. Cf. *Ridyolph v. State*, 503 S.W.2d 276, 277 (Tex.Cr. App. 1974). In quoting from *United States v. Agurs*, on this point, the majority apparently does not understand that the excerpt is part of musing by the Supreme Court in formulating a standard of materiality for writings *not* specifically requested by defense counsel.