**Jane Ada CALLAWAY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 07–88–0191–CR.**

Court of Appeals of Texas,
Amarillo.

June 26, 1991.

Rehearing Overruled Aug. 9, 1991.

Discretionary Review Refused
Nov. 20, 1991.

Rehearing Denied Feb. 5, 1992.

818

Stanley G. Schneider, Houston, for appellant.

John B. Holmes, Dist. Atty., Alan Curry, Charles Rosenthal and Lyn McClellan, Houston, for appellee.

Before REYNOLDS, C.J., and DODSON and BOYD, JJ.

REYNOLDS, Chief Justice.

A jury convicted appellant Jane Ada Callaway, charged with causing the death of Judy Woods Saragusa, of capital murder, but at least ten jurors had a reasonable doubt that there was a probability she would commit criminal acts of violence that would constitute a continuing threat to society. Pursuant to article 37.071(e) of the Texas Code of Criminal Procedure (Vernon Supp.1991), the trial court sentenced her to confinement for life in the Texas Department of Corrections.[1]

Seeking a reversal of her conviction on twenty-one points of error, appellant contends that:

(1–2) The trial court abrogated her right to cross-examine adverse witness Michael Saragusa;

(3–4) The trial court erred in overruling her motions for mistrial upon introduction of, and for an instruction to disregard evidence concerning, an extraneous offense;

(5) The trial court erred in sustaining the State's objection regarding her testimony of conversations she had with the deceased;

She was denied due process by (6) the trial court's refusal to disclose, and (7) the State's suppression of exculpatory evidence, and by (8) the State's suppression of its plea agreement with Marion Eugene Scranton;

(9) She was denied a fair trial by the prosecutor's suppression of exculpatory evidence concerning her relationship with Michael Saragusa;

(10–11) The trial court erred in overruling her objection to Michael Richardson's testimony regarding the extraneous offense of solicitation of capital murder;

(12) The evidence is insufficient to corroborate the accomplice witness testimony of Michael Richardson;

(13) Her right to a fair trial was abrogated by intentional misconduct of the State;

(14) The State's suppression of *Brady* material, intentional disregard of the trial court's instructions, and investigation of defense attorneys and investigators abrogated her constitutional right to counsel;

(15–18) The trial court erred in overruling her motion to suppress evidence based upon her arrest;

(19–20) She was denied due process by the systematic exclusions of Hispanics on the jury panel; and

(21) She was denied equal protection of the law by the State's arbitrary decision to selectively prosecute her for capital murder when other persons similarly situated were prosecuted only for murder.

On the rationale expressed, we will overrule the points of error and affirm the judgment of the trial court.

A voluminous record, highlighted by counsels' extensive briefings, reveals the State alleged, and marshaled its evidence to show, that on or about September 2, 1987[2] appellant, through the employment of Leon Hawkins, Jr., caused the death of Judy Woods Saragusa, who resided with her husband, Michael Saragusa, in Houston. The Saragusas owned a yacht sales company, the Marine Group, and Michael Saragusa was an executive vice-president and 50% owner of Quality Beverage Company.

---

1. Now, the Texas Department of Criminal Justice, Institutional Division.

2. Unless otherwise identified, all dates recited are in the calendar year 1987.

Saragusa hired appellant as a secretary at Quality Beverage on January 26th. Because appellant was a good secretary, her salary was increased and she eventually assisted Saragusa with his personal finances. During her employment, appellant and Saragusa had an affair, the length and intensity of which were disputed.

By virtue of her employment, appellant became acquainted with Judy Saragusa. Michael Richardson testified that on several occasions, appellant solicited him to kill a lady, who it developed was Judy Saragusa, but he refused. At appellant's request, he picked up $20,000 at appellant's bank, and delivered it to appellant. Shortly afterwards, appellant gave Richardson two envelopes, one containing $10,000 he was to hold, and the other to be given to Marion Eugene Scranton, who, Richardson knew, was supposed to kill some lady. Richardson looked inside the envelope he was to give Scranton and saw a green piece of paper with the address 5005 Greentree, the Saragusas' address, written on it. When, at Scranton's request, Richardson told appellant that Scranton was not going to do anything like that, appellant told him that she would pay his brother, Leon Hawkins, Jr., to kill the lady.

On August 28, Richardson and Hawkins went to appellant's house. Richardson observed appellant give Hawkins a gun and show him a picture of the person she wanted him to kill. The photograph was recovered from appellant's house and a witness identified one of the people in the picture as Judy Saragusa. Appellant then drove Richardson and Hawkins to and pointed out the house where the Saragusas resided. The next day, Hawkins told Richardson that appellant had offered him $50,000.00 for killing a lady.

On September 1, Richardson drove Hawkins to Quality Beverage for the purpose of obtaining appellant's car. Richardson and Hawkins went inside to appellant's desk, and appellant accompanied them outside, where she gave Hawkins some keys and an envelope. Hawkins went to, entered, and started appellant's maroon Cadillac.

On September 2, Craig Nimer, a security guard, was patrolling the neighborhood where the Saragusas resided when he observed a black man driving a maroon or burgundy Cadillac. At about 4:30 p.m., he observed Judy Saragusa drive by in her Jaguar and they waved to each other. Shortly thereafter, Nimer observed the Cadillac headed in the direction of the Saragusa home. Nimer then walked to the Saragusa driveway and observed the Cadillac, bearing the license plate number that was on appellant's Cadillac, parked next to Judy Saragusa's Jaguar.

As Nimer returned to his patrol car, he heard what he believed was a gunshot. Going back towards the Saragusa house, he saw the Cadillac pull out of the Saragusa driveway. Nimer later identified Hawkins as the man he had seen in the Cadillac on the day of the murder.

Nimer and Ledet, another security officer, subsequently entered the home and found Judy Saragusa's body. It was later determined that the cause of death was a gunshot wound to the deceased's right ear.

On September 4, Hawkins was interviewed by the Houston Police Department. Recovered from Hawkins was a Continental Airlines' ticket envelope bearing his fingerprint and containing a plane ticket used for an 8:40 p.m. flight on September 2 to San Francisco, which was shown to have been purchased by appellant in the name of "Tony Brooks." He also possessed the keys to appellant's Cadillac, which was located in the parking garage of the airport where Hawkins' ticketed flight was scheduled to depart. The fingerprints of Hawkins and his common-law wife, Benedetta Little, were discovered on the outside of the automobile.

After interviewing Hawkins, several Houston policemen went to his residence, where they met Little. She had found a gun hidden in the mattress of their bed, removed it, and hid it under a porch of a nearby house. She took the officers to the house, where they recovered a .22 caliber pistol from under the porch.

The pistol, so the firearms examiner determined, fired the bullet recovered from the deceased's body. This gun was purchased by appellant's ex-husband, Charles

Beaschler, and given to Hawkins by appellant, who admitted that the gun looked exactly like the one Beaschler had purchased for her.

Appellant's first- and second-point-of-error contentions of an abrogation of the right of cross-examination of Saragusa are grounded on an event occurring during his cross-examination. He was questioned about his relationship with Ronald C. Martin, an ex-employee of Quality Beverage to whom Saragusa had made an unpaid loan and who had visited in Saragusa's office. When Saragusa was asked whether, after the visit, he had contacted any member of the Houston Police Department about his business, the prosecutor requested an ex parte conference with the court. Defense counsel interposed no objection to the conference; he only asked if the conference would be put on the record, and the court replied that it would be sealed.

In chambers, in the absence of appellant and her counsel, the prosecutor informed the court that when it appeared to the district attorney's office that private investigators for the defense had approached, and offered to purchase testimony of, witnesses, an investigation was launched. Martin, whose real name is Ronald Coleman Morton, had been invited to and, wearing a tape recorder, did meet with a defense investigator, who did not approach an impropriety of buying testimony. A future meeting was indicated, with Morton being asked to think about whether Saragusa engaged in specified activities. Then, Saragusa took Morton to the district attorney's office. The prosecutor suspected that the ex parte conversation would alert the defense to the on-going investigation and, to preserve its integrity, proposed to the court that "certain areas," which did not directly affect the credibility of Saragusa, needed to be excluded from cross-examination. Therefore, he suggested that the prosecution "might need to make an objection and ask the Court to rule on it in that light."

Following the ex parte conference, appellant's cross-examination of Saragusa continued for the remainder of the day's proceedings. He was asked a number of questions about Morton's hiring, job tasks, and employment record. The prosecution made no objection to any question on the ground that it pertained to any matter mentioned during the ex parte conference.

On the following morning, and before the cross-examination of Saragusa continued, appellant moved the court to make her aware of the in camera hearing, stating that effective cross-examination of Saragusa was impaired if she does not have access to the same information that the prosecutor had. The court denied the request.

After sentence was imposed, appellant filed her motion for new trial, alleging that her right to a fair trial was abrogated by the court's failure to divulge the contents of the ex parte communication. At the hearing on the motion, the court ordered the ex parte hearing transcribed and disclosed to appellant's counsel, but denied the motion for new trial. Appellant filed her notice of appeal.

Following receipt of the transcription, appellant filed a supplemental motion for new trial and a motion to reconvene the hearing on her motion for new trial. In her supplemental motion, appellant asserted that her right to effective assistance of counsel and a fair trial was abrogated by the State's investigation and requested that a hearing be granted. At the hearing on the motion, the court denied her motion to reconvene the hearing, but permitted defense counsel to state on the record the basis for the motion.

Defense counsel's statement articulated five major beliefs. He believed the evidence would show that investigators for Saragusa were investigating investigators of the defense's trial counsel; that the representations made to the court were inaccurate; that the investigators for the district attorney's office and Saragusa were attempting to hinder the investigation of defense counsel and his investigators by intimidating them, intimidating witnesses, and trying to influence witnesses not to testify; that the actions of Saragusa in investigating the defense were an attempt to shield himself from the State's investigation; and that the information from the ex parte hearing should have been made available for cross-examination so that the de-

fense could have established Saragusa's bias and to show that he was an active participant rather than simply the husband of the deceased.

On appeal, appellant, asserting that the trial court should not have agreed to hold the ex parte conference requested by the State, contends that her right to cross-examine Saragusa was abrogated by the State's intentional decision not to inform the defense of the unsuccessful attempt of Saragusa to initiate a criminal investigation of defense counsel and their investigators. As a result, she declares, Saragusa was allowed to withhold material evidence from the jury, and to shade evidence concerning his involvement with potential witnesses, herself, and ultimately, his involvement in his wife's death.

■■■ At the threshold of the consideration of appellant's first two contentions, it is observed that by not objecting to the ex parte conference and thereafter proceeding with the trial, appellant cannot fault the court for holding the conference. *Satterwhite v. State*, 499 S.W.2d 314, 316 (Tex.Cr. App.1973). Nor is appellant in a position to fault the court for not disclosing the contents of the ex parte conference. Since the request for the disclosure was not made at the earliest opportunity, it came too late to preserve any error. *Cisneros v. State*, 692 S.W.2d 78, 82 (Tex.Cr.App.1985). And, although the record indicates that defense counsel was informed of the contents prior to the hearing of the motion for new trial,[3] the attempt to predicate error on the record developed after the supplemental motion for new trial was filed is unavailing. Being filed after the motion for new trial was overruled and notice of appeal was filed, the supplemental motion was untimely. Tex.R.App.P. 31(a)(2). Thus, the record developed in connection therewith is not properly a part of the record on appeal. *Heckathorne v. State*, 697 S.W.2d 8, 10 (Tex. App.—Houston [14th Dist.] 1985, pet'n ref'd).

■■■ Nevertheless, because of the unusualness of the ex parte conference, the record has been reviewed to determine whether injury was shown, or whether there are facts from which injury can be inferred, to result to appellant from the conference so as to mandate a reversal. *Mares v. State*, 571 S.W.2d 303, 307 (Tex. Cr.App.1978). In doing so, it is noticed that appellant's right to cross-examine Saragusa about Morton was not curtailed as a result of the conference, there being no objection by the prosecutor based on the subject matter of the conference. Indeed, in the cross-examination of Saragusa covering over 700 pages of the statement of facts, defense counsel, in addition to thoroughly exploring Saragusa's relationship with Morton, established that: Saragusa had not spoken to anyone representing the accused outside of court, had visited with the prosecutor extensively about his testimony prior to trial, had given a written statement to the police, had hired a criminal defense attorney to represent Quality Beverage in the proceeding, had recorded telephone conversations with the accused after his wife's death in an effort to establish appellant's guilt, had consented to a search of his office, had turned over letters purportedly written and sent to him by appellant after the murder, and had referred to appellant as "that woman" and a liar.

Given these circumstances, there was manifested to the jury the full range of defense counsel's expressed belief of Saragusa's involvement—his relationship with Morton, the extent of his active participation in the investigation, and his bias. Then, the circumstances show neither injury nor the inference of injury to appellant, since the presence of appellant and her counsel at the conference would not have added anything substantial to the opportunity to defend. *Id.* The first two points of error are overruled.

By her third- and fourth-point contentions of error, appellant faults the trial court for overruling her motion for mistrial when the State introduced an extraneous

3. Counsel for appellant at the post-judgment proceedings and on appeal was not appellant's trial counsel.

offense alleged to have occurred on June 22, without proving a nexus between her and the alleged perpetrator, and for overruling her motion to disregard the evidence when the court found no evidence linking her to the offense. An extended recitation from the lengthy record is necessitated.

Prior to trial appellant filed, and the court granted, her motion to prohibit the State from mentioning any extraneous offenses or acts of misconduct before approaching the bench. During his cross-examination, Saragusa recalled his loaning a Waltham .380 automatic pistol to appellant. In the ensuing examination to fix the time of Saragusa's acquisition of the weapon, the following is recorded:

Q. Wasn't it after the episode you told this jury about the other day?

A. Which episode is that, sir?

Q. Didn't you refer to an episode or an event that you didn't go into any detail about, but an event in June of 1987?

A. I'm not sure what event you are referring to.

Q. Yes, sir. Well, I'm talking about an event where a pistol was discharged.

A. Yes, sir.

Q. And when was that event?

A. June 22nd.

Thereafter, the State noticed its intent to introduce the fact that on or about June 22, appellant conspired with Beaschler to threaten the deceased with a firearm.

In this regard, the prosecutor informed the court that, in brief, the State would proffer Saragusa to testify that in the afternoon or evening hours of June 22, he called his office and appellant told him that earlier she had requested Mrs. Saragusa to take her to her house so she could get a wrecker slip necessary to retrieve her Cadillac from the repair shop. While at the house they were confronted by a man, who, holding a pistol, threatened them. As the man ordered them about the house, Judy Saragusa took her own gun from her purse and fired at the man, who fled. Appellant decided it was best not to call the police to alert them.

Further, the State expected to show by the testimony of Beaschler that he was the man inside the house, and that he was there at the request of appellant, who asked him to have the pistol to scare Mrs. Saragusa. The State also expected the evidence to show that the weapon used by Beaschler was the murder weapon.

Volunteering that the proffered evidence is not, and does not become, an offense until Beaschler shows that he was solicited by appellant to perform the act, the State proposed that the extraneous offense was admissible to show, with other evidence, a continuing transaction of an assaultive offense toward the deceased that ended in her death. Over appellant's objection, the court, after inquiring into the bases for and against admitting the evidence, ruled that, within the parameters proffered to the court, Saragusa could relate his conversation with appellant concerning the June 22nd incident. The court allowed appellant a running objection.

Before the jury, Saragusa gave the details of his conversation with appellant. After the telephone conversation, he returned to Houston from Dallas and was told a similar story by Judy Saragusa. The intruder was compositely described as a tall, slender, very well dressed white male in his sixties, wearing thick eyeglasses. Appellant described the weapon possessed by the man as a small, chrome or silver or stainless steel colored automatic weapon. Later that evening, appellant and Judy Saragusa acted out their various actions during the incident.

Saragusa and Mike Reed, the Saragusas' neighbor who had a business relationship with Quality Beverage, inspected appellant's home for an indication of the intruder's entry. In appellant's bedroom, Saragusa found a .22 caliber shell, and Reed observed a box of .22 shells partially opened and three to five shells on the bed.

Reed and Janie Boyles, an employee of Quality Beverage, gave accounts of the incident as it was described to them by appellant. Jean Barnes, a secretary at Quality Beverage, testified to a similar account of the incident as it was recounted to her by both appellant and Judy Saragusa.

In a series of meetings outside the presence of the jury, the prosecutor informed the court that the State had intended to call Beaschler as a witness, but had been informed that he was hospitalized in Virginia as the result of back surgery and could not be released for two or three weeks. A proposal for the parties to travel to Virginia to take a video tape deposition of Beaschler and play the tape was announced to the jury. Later, the prosecutor was informed by an attorney who represented Beaschler that Beaschler would recant his prior statement that he was the gunman in appellant's home on June 22 when appellant and Judy Saragusa were threatened. The prosecutor asserted that Beaschler's deposition could not be taken if the defense objected and, when the defense objected, the State orally moved for a continuance until Beaschler could testify. The court deferred a decision on the motion until the last witness testified.

Interspersed with and after these meetings, the State, over appellant's objection that the State was trying to link her to the extraneous offense, adduced from several witnesses testimony concerning Beaschler. Mildred Beaschler, Beaschler's ex-wife of 44 years, identified two photographs of her ex-husband and his signature on a record showing his purchase of a firearm, which was identified as the murder weapon.

Sergeant L.B. Smith, a Houston Police Department detective, testified, over objection, that on October 28, he met Beaschler, the man in the same two photographs previously identified by Mildred Beaschler. Sergeant Russell Dunlap, a Houston police officer, interviewed Beaschler and described him as an elderly white male in his sixties, who wore uncommonly thick eyeglasses and whose walk was unsteady.

Bertha Pitts, who worked for appellant as a maid about one day a week during 1987, identified the man in the two photographs, which others identified as Beaschler, as a person she had seen in appellant's house. She testified, over objection, that she had been in appellant's house when it was locked and observed the man depicted in the photographs enter the home. She last saw that man at appellant's house about two weeks before the murder.

Patricia Avery testified that she and her husband had a part-time gun sales business. She identified an Alcohol, Tobacco and Firearms purchase record, admitted into evidence, which showed that Beaschler purchased a Jennings, Model J, .22 pistol, serial number 03761619, at the Houston Astro Gun Show on June 14. The gun was identified as the murder weapon. That portion of the document completed by Beaschler showed his residence to be 7803 Sands Point, Houston, Texas, which was appellant's address. It also showed that he was six feet tall, weighed 150 pounds, was a white male, and was born on July 22, 1905 in Ohio. The photographs of the weapon reveal a small pistol with a light colored barrel and darker handles.

The State offered a stipulation, admitted over appellant's objection, that if Dr. Ronald J. Bortnick were to testify, he would say that he performed surgery on Beaschler and, due to his condition, he would be unable to travel for about three weeks. Later, the defense agreed to the stipulation. The State rested without renewing its previous oral motion, or moving in writing, for a continuance to secure Beaschler's testimony.

Appellant requested the court to instruct the jury to disregard any testimony regarding the June 22 incident. The court, remarking that it found no culpability on appellant's part regarding the June 22 event, denied the request, and overruled appellant's succeeding motion for a mistrial because of the State's failure to link her to the incident, the actions giving rise to appellant's third and fourth points of error.

■ In response to the points, the State initially suggests that in questioning Saragusa, defense counsel introduced evidence concerning the extraneous offense, thereby waiving appellant's claimed error when the State merely evidenced the events. However, a careful review of the record referred to by the State reveals no more than that defense counsel questioned Saragusa about a gift of a gun to appellant as the result of a gun being discharged on June

22. There was nothing in the questioning about any facts which constituted an extraneous offense so as to waive objection to the State's subsequent attempt to evince an extraneous offense.

■ Alternatively, the State proposes that any error in the admission of the extraneous offense was waived when the defense cross-examined the State's witnesses about the June 22 incident. To the contrary, a careful review of the record reveals that appellant was merely attempting to meet, destroy or explain away the evidence in connection with the extraneous offense. When the defense does no more, there is no waiver of a timely and appropriate objection to inadmissible evidence. *Sweeten v. State,* 693 S.W.2d 454, 456–58 (Tex.Cr.App.1985).

■ The State also questions whether appellant failed to preserve error with her running objection to the evidence, *see Goodman v. State,* 701 S.W.2d 850, 863 (Tex.Cr.App.1985), *overruled on other grounds, Hernandez v. State,* 757 S.W.2d 744, 752 n. 15 (Tex.Cr.App.1988); yet, it is apparent from the pretrial order and the trial record that the trial judge and the prosecution were conscious of the substance of the appellant's objection. Hence, her objection preserved the complaint for review. *Thomas v. State,* 723 S.W.2d 696, 701 (Tex.Cr.App.1986).

Although, as previously noticed, the State originally proposed to evidence the June 22 events as an admissible extraneous offense by appellant, now the State, absent Beaschler's testimony and in agreement with the trial court's view, maintains that appellant was not connected with the offense, but that the evidence was otherwise admissible. Since the State failed to connect appellant to any criminal conduct, an extraneous offense by appellant was not established. *Harris v. State,* 738 S.W.2d 207, 224 (Tex.Cr.App.1986), *cert. denied,* 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987). Nevertheless, appellant argues that by the evidence, the State was allowed to present, through innuendo and implication, that the murder weapon was purchased by Beaschler, who used it to threaten the deceased. The question, then, is whether the evidence was admissible so as

to escape a mistrial or, alternatively, an instruction to disregard.

■ To be admissible, evidence must be "relevant," *i.e.,* "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," and its relevancy value must not be substantially outweighed by the danger of unfair prejudice or confusion. Tex.R.Crim.Evid. 401–03. Although it may not necessarily influence consequential facts, background evidence is relevant, *Burns v. State,* 556 S.W.2d 270, 282 (Tex.Cr.App.), *cert. denied,* 434 U.S. 935, 98 S.Ct. 422, 54 L.Ed.2d 294 (1977), because it furnishes the context for a realistic comprehension and evaluation of evidence of the offense by the factfinder. *Albrecht v. State,* 486 S.W.2d 97, 100 (Tex. Cr.App.1972). The rationale for the admission of relevant, contextual background evidence is not of recent origin, *Nothaf v. State,* 91 Tex.Cr.R. 619, 240 S.W. 936, 937 (1922), and, generally, the determination of relevant evidence in a particular factual situation is entrusted to the discretion of the trial judge. 1 Wharton, Criminal Evidence § 91 (14th ed. 1985).

■ Accepting that the trial court admitted the events of June 22nd upon the State's representation to evince appellant's commission of an admissible extraneous offense, the court refused to strike the evidence when the State failed to connect appellant to wrongful conduct on that date. Then, it must be presumed that the court determined the evidence was relevant and its value outweighed any prejudicial effect. This seems apparent even though the court directed the prosecutor not to mention the incident during final argument and, when in argument the prosecutor referred to "the shooting incident at Callaway's home," instructed the jury "in very strong language" not to mention or consider the occurrence individually or as a group during deliberations.

It is documented that the evidence was admitted after appellant inquired of Saragusa concerning his providing her with a pistol and attempting to fix the time in

relation to "an event where a pistol was discharged" on "June 22nd." Once a matter is injected into the proceeding, evidence to fully explain the matter is relevant and admissible, Rule 107, Texas Rules of Criminal Evidence, even though the evidence might not otherwise be admissible. *Parr v. State*, 557 S.W.2d 99, 102 (Tex.Cr.App. 1977).

It follows that the trial court, exercising its discretion to determine the relevancy of the admitted evidence under guiding principles, cannot be held to reversible error in refusing to declare a mistrial because of the admission of the evidence or to instruct the jury to disregard it. Appellant's points of error three and four are overruled.

With her fifth point of error, appellant contends that the trial court erred in sustaining the State's objection to her testimony regarding conversations she had with the deceased. A brief factual statement positions appellant's developed contention that she was entitled to explain her state of mind over the State's sustained hearsay objection.

The Saragusas purchased a home at 5005 Greentree with financing obtained from Republic Bank in Houston. When Republic learned that the Saragusas would be remodeling the home too, the bank requested that they make the expenditures through that bank. Consequently, Saragusa transferred money from his personal account at River Oaks Bank and Trust in Houston to a remodeling account at Republic. When problems arose in paying workers, Saragusa signed a written agreement which allowed him and appellant to transfer funds from the River Oaks Bank and Trust account. Later, a wire transfer system, using a code to which only appellant had access, was employed to speed the transfer of funds.

Although Saragusa had no account at Allied Bank West in Houston, on August 3, appellant, who had an account at that bank, signed documents, which had been obtained by Richardson at her request, to open an account, understood by Rosemary Powers, the bank's loan secretary, to be appellant's personal checking account. However, the account was styled "5005 Greentree Con-struction Account," and was funded with $30,000 transferred by wire from River Oaks Bank and Trust. The monthly bank statements were to be sent to appellant's home address.

On August 7, appellant telephoned Ms. Powers, said she could not come to the bank but that she needed the $30,000, and that it would be picked up by Richardson, who she said was the architect for the construction she was having done. At Ms. Powers' suggestion, the amount was reduced to $20,000, the amount received by Richardson as recorded earlier in this opinion.

Appellant testified that based upon a conversation she had with the deceased, she opened a personal account at Allied Bank West in Houston on August 3. The signature card, signed by appellant, designated the account name as "5005 Greentree." She opened the account on specific instructions, but neither Saragusa nor anyone at Quality Beverage gave her those instructions. The wire transfers and all transactions were conducted after she had conversations with the deceased. She admitted sending Richardson to the bank to cash a check and pick up the cash.

After the court sustained the State's objections to details of the conversations between appellant and the deceased, appellant testified outside the presence of the jury. She stated the deceased told her she had discovered that should there be a divorce, she would gain nothing from Saragusa's interest in Quality Beverage, and she wanted to place as much money and property as possible into the 5005 Greentree house. Then, appellant testified, the deceased instructed her to establish the Allied Bank West accounts and to make the wire transfers from River Oaks Bank and Trust, when to write the checks and in what amounts, and told her to arrange for Richardson to pick up the cash at Allied Bank West. On one occasion, the deceased, who had been given Richardson's telephone number, told her that she had contacted Richardson and he was working in her backyard.

Appellant presented Pat Johnson, a tax and corporate attorney in Houston, whose firm represents Quality Beverage and Saragusa. He testified about how Saragusa acquired various amounts of stock in Quality Beverage, and concluded that about ninety-nine percent of Saragusa's stock in Quality Beverage was his separate property. However, Danny Needham, a family law attorney in Amarillo who listened to the testimony of Pat Johnson, concluded that the stock purportedly owned by Saragusa in Quality Beverage was substantially community property.

In the presence of the jury, David Sahadi testified that he delivered three rugs to the Saragusa home on August 31 or September 1, and the deceased kept one of them valued at approximately $30,000. He was not paid for the rug.

 Appellant initially offered the admission of the conversations under section 19.06 of the Texas Penal Code Annotated (Vernon 1989),[4] without proposing an exception to the hearsay objection interposed by the State. Recognizing that the statute does not extend the rules of evidence to admit hearsay that is otherwise inadmissible, *Werner v. State*, 711 S.W.2d 639, 643–44 (Tex.Cr.App.1986), the court allowed defense counsel some latitude in asking questions but stated that he would not be allowed to go into specific conversations. Subsequently, counsel, stating that since the State was allowed, over objection, to admit evidence of alleged "thefts" via the wire transfers, offered the evinced conversations not for the truth of the matter asserted, but to show appellant's state of mind at the times of her actions respecting the bank account. Appellant urges the same reasoning on appeal.

Hearsay is an out-of-court statement which is offered in court for the truth of the matters asserted therein and rests on the credibility of the asserter. Tex.R.Crim. Evid. 801(d); *Barnard v. State*, 730 S.W.2d 703, 723 (Tex.Cr.App.1987). A statement offered for some purpose other than the

truth of the matter asserted is not hearsay. *Livingston v. State*, 739 S.W.2d 311, 331 (Tex.Cr.App.1987), *cert. denied*, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988). Generally, information disclosed to one in a telephone conversation is hearsay. *Dalton v. State*, 516 S.W.2d 937, 939 (Tex. Cr.App.1974).

In arguing that the conversations were not offered for the truth of the matter asserted, but to show her state of mind relevant to her actions, appellant asserts that the conversations "were relevant to the efforts or desires of Judy Saragusa to invest money on the 5005 Greentree house." Yet, the efforts or desires of the deceased could have no bearing on appellant's state of mind, *i.e.*, she acted at or in compliance with the deceased's directions, unless the conversations were accepted as true. *Van Byrd v. State*, 605 S.W.2d 265, 269 (Tex.Cr.App.1980). Thus, for appellant to have the state of mind she represents, the conversational statements had to be taken as true, the purpose for which they were used. *Love v. State*, 581 S.W.2d 679, 681 (Tex.Cr.App.1979). In this light, the court did not err in sustaining the hearsay objection to the proffered conversations. Point of error five is overruled.

Using her points of error six through eight, appellant complains that she was denied due process. The denial occurred, she contends, by the State's suppression, and the court's refusal to require the State to disclose, exculpatory or impeachment evidence contained in Marion Eugene Scranton's sworn statement, and by the State's suppression of a plea agreement between the State and Scranton.

Prior to trial, appellant moved for production of evidence favorable to her, particularly the evidence which was inconsistent with the State's theory of the case. The State objected to disclosing any evidence in its possession which was inconsistent with its theory, but the court instructed the prosecutor to give the defense any possible

---

4. The statute provides that: "In all prosecutions for murder or voluntary manslaughter, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense."

*Brady*[5] material. In response, the prosecutor, expressing an intent to make all disclosures, requested the court to insure that nothing was missed by making an in camera inspection of the items for a determination whether they were *Brady* material. Receiving an affirmative indication, the State delivered its offense report, which contained the statement of Scranton, to the court. Scranton's statement was not made available to the defense, although one of appellant's counsel discovered Scranton had made a statement, reportedly about appellant's lack of involvement in the murder, that was in the offense report.

Scranton had been charged as a co-defendant with conspiracy to commit the capital murder of the deceased. His written statement was dated September 5. Scranton's counsel testified at the hearing on appellant's motion for new trial that Scranton had entered into a plea agreement with the State on November 24, a date approximately six months prior to appellant's trial. The State's original offer was not to oppose probation upon his guilty plea to "PSI" if he would provide background information and be truthful in all responses. On March 25, 1988, two months before appellant's trial, the framework of the agreement was discussed, albeit the prosecutor testified that no firm offer was made. After appellant's trial, Scranton entered a guilty plea, resulting in a 10–year sentence and a $1,000 fine.

The written statement signed by Scranton, who was not a witness at appellant's trial, differed in some respects from the testimony given by Richardson at the trial concerning the extent of their, and appellant's, involvement in the negotiations "to kill a white lady." Appellant, admitting that Scranton's statement would not be discoverable unless he was testifying, nevertheless concludes that in light of Richardson's testimony, it constituted *Brady* material, which was intentionally and deliberately suppressed by the State, thereby allowing Richardson to commit perjury in testifying in the manner in which he did.

■ A prosecutor has a constitutional duty to disclose evidence material either to the guilt or punishment stages of the trial, with or without a request, *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985), since the suppression by the State of such evidence violates due process, regardless of the good or bad faith of the prosecution. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963). This due process disclosure requirement applies to the suppression of exculpatory evidence, impeachment evidence, and evidence of a promise or inducement made to a testifying witness. *United States v. Bagley*, 473 U.S. at 683–84, 105 S.Ct. at 3384.

Consequently, the duty to disclose evidence favorable to the defense is not measured by the moral culpability, or willfulness, of the prosecution; it is the character of the evidence, not the character of the prosecutor, which determines whether its suppression is constitutional error. Nevertheless, unless an omission to disclose deprives the accused of a fair trial, there is no violation and no breach of a constitutional duty to disclose. *United States v. Agurs*, 427 U.S. 97, 109–10, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976).

■ In determining whether the State's omission to disclose Scranton's sworn statement is reversible error, it will be accepted that the statement was favorable to the defense, leaving for determination the materiality of the statement. *See Moore v. Illinois*, 408 U.S. 786, 794–95, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972); *Crawford v. State*, 617 S.W.2d 925, 931 (Tex.Cr. App.1980), *cert. denied*, 452 U.S. 931, 101 S.Ct. 3067, 69 L.Ed.2d 431 (1981). In this regard, the mere possibility that the undisclosed sworn statement might have aided appellant does not demonstrate its materiality in the constitutional sense. *United States v. Agurs*, 427 U.S. at 110, 96 S.Ct. at 2400; *Stone v. State*, 583 S.W.2d 410, 415 (Tex.Cr.App.1979).

■ Evidence is material where there is a reasonable probability that had the evidence been disclosed to the accused, the

---

**5.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

result of the proceeding would have been different. A reasonable probability is one adequate to undermine confidence in the outcome of the trial. *United States v. Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383. However, if the evidence withheld is not admissible, it is not material. *Iness v. State*, 606 S.W.2d 306, 310 (Tex.Cr.App. 1980).

Where a person who has made a written statement does not testify at trial, the statement itself is inadmissible as hearsay and it cannot be used by the defense to impeach another witness. Tex. R.Crim.Evid. 802; *Iness v. State*, 606 S.W.2d at 310. Thus, since Scranton did not testify at trial, his sworn statement not only was inadmissible, but it could not be used to impeach Richardson. It follows that the nondisclosure of the statement neither violated the rule established in *Brady*, *id.*, nor satisfied appellant's burden to prove her claim that, because of the contents of the statement, the State knowingly allowed Richardson to commit perjury. *See Hawkins v. State*, 660 S.W.2d 65, 75 (Tex.Cr.App.1983). Points of error six, seven, and eight are overruled.

Appellant drafts her ninth point of error to contend that her right to a fair trial was abrogated by the prosecutors' suppression of exculpatory evidence concerning her relationship with Saragusa, which was contained in an oral statement made by Craig Nimer to a police officer on September 2, after completion of his written statement. The gist of the oral statement of Nimer, one of the security guards who discovered the deceased's body, was that about two weeks earlier, he met Saragusa when appellant was with him at the Saragusa home, heard Saragusa call her "honey," and assumed that appellant was Saragusa's wife.

In presenting her contention, appellant candidly concedes that Nimer's oral statement was not per se exculpatory; but, she submits, it corroborated her testimony of a continuing sexual relationship with Saragusa and was inconsistent with both his testimony of a short, terminated affair and the State's theory of prosecution. She further candidly concedes that this evidence "probably would not have materially affected the outcome of the trial and, as such, [its suppression] would not constitute reversible error;" yet, she reasons, the repeated suppression of impeachment or exculpatory evidence resulted in a denial of due process.

If it be granted that Nimer's oral statement should have been earlier disclosed to the defense, the mere possibility that it might have aided the defense, when considered with appellant's concession that its disclosure probably would not have materially affected the outcome of the trial, fails to establish its "materiality" in the constitutional sense. *United States v. Agurs*, 427 U.S. at 109–10, 96 S.Ct. at 2400. Beyond that, appellant may not couple the suppression of Nimer's statement with the previously addressed nondisclosures, which were held not to be reversible error, to claim repeated error calling for a reversal. *Stoker v. State*, 788 S.W.2d 1, 18 (Tex.Cr. App.1989), *cert. denied*, —— U.S. ——, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990). The ninth point is overruled.

With her tenth and eleventh points, appellant charges the trial court with error in overruling (1) her objection to Richardson's testimony regarding the extraneous offense of solicitation to commit capital murder involving Scranton and her, and (2) her hearsay objection to Richardson's testimony regarding statements made by Scranton regarding the commission of an extraneous offense of solicitation of capital murder. The State offered the testimony as part of the same continuing conduct, a "continuing conspiracy, continuing goal of seeking the death of Judy Saragusa."

Upon appellant's objection that the only way the statements would be admissible would be under the co-conspirator exception to the hearsay rule, rule 801(e)(2)(E), Texas Rules of Criminal Evidence, the court held a hearing outside the presence of the jury concerning the conspiracy. Following the hearing of Richardson's testimony, the court, finding a continuing course of conduct, allowed the testimony before the jury.

Appellant faults the court for denying her a fair trial by allowing the State to

introduce the out-of-court declarations of Scranton without any proof that he was part of the same conspiracy which resulted in the deceased's death. Proof was lacking, appellant asserts, because Richardson, though testifying that appellant was attempting to solicit Scranton to commit the offense of capital murder, denied participating in the offense, and Scranton, after receiving the money, told Richardson that he was not going to do anything. Then, in appellant's view of the testimony, there was no evidence that she, Richardson and Scranton agreed, via their conversations, on a common goal and objective. Neither, she concludes, did the State, as required by *Denney v. State*, 558 S.W.2d 467, 469 (Tex. Cr.App.1977), *cert. denied*, 437 U.S. 911, 98 S.Ct. 3104, 57 L.Ed.2d 1142 (1978), establish the conspiracy by evidence independent of the hearsay statements in order for the statements to be admitted.

In response, the State first offers that much of Richardson's testimony involving Scranton came from Richardson's personal observations which, even if evincing an extraneous offense, were admissible, without regard to the hearsay rule or its exceptions, as a part of one continuous transaction "to show the context in which the criminal act occurred." *Lincecum v. State*, 736 S.W.2d 673, 681 (Tex.Cr.App. 1987) (quoting *Archer v. State*, 607 S.W.2d 539, 542 (Tex.Cr.App.1980)), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2835, 100 L.Ed.2d 936 (1988). Next, the State proposes that much of Richardson's testimony was based upon statements of appellant herself, which were clearly admissible. Tex. R.Crim.Evid. 801(e)(2)(A). Finally, the State points out that *Denney* was decided before the adoption of rule 801(e)(2)(E), which provides that a statement by a co-conspirator during the course and in furtherance of the conspiracy is not hearsay and is admissible.

The Texas Rules of Criminal Evidence are derived from the Federal Rules of Evidence and, in the construction of the Texas rules, persuasive value is accorded the federal decisions interpreting the federal rules. Texas rule 801(e)(2)(E) is identical to federal rule 801(d)(2)(E), which was construed in *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

The *Bourjaily* court held that before a co-conspirator's declaration is admissible over objection, there must be evidence that there was a conspiracy in connection with the declarant and the non-offering party, and that the statement was made during the course and in perpetuation of the conspiracy. 483 U.S. at 175, 107 S.Ct. at 2778. Contrary to appellant's contentions that the conspiracy must be established independent of declarations, hearsay statements may be considered by the trial court in determining whether evidence is admissible under the co-conspirator rule unless the rules of privilege dictate otherwise. *Id.* at 181, 107 S.Ct. at 2781.

The existence of a disputed conspiracy must be proved by a preponderance of the evidence, *id.* at 175, 107 S.Ct. at 2778, and it may be established by direct or circumstantial facts and may be inferred from the evidence. *Grant v. State*, 140 Tex.Cr.R. 46, 143 S.W.2d 383, 384 (1940). Each declaration or act of a co-conspirator up until the object of the conspiracy is complete is admissible, *Helms v. State*, 493 S.W.2d 227, 230 (Tex.Cr.App.1973), although it occurred out of the presence and hearing of the defendant. *Saddler v. State*, 167 Tex.Cr.R. 309, 320 S.W.2d 146, 149 (1959). A conspiracy includes everything within the contemplation of the conspirators, and a conspiracy is terminated only after every act subsequent to the commission of the offense within the plan and breadth of the conspiracy has been performed. *Baugh v. State*, 135 Tex.Cr.R. 590, 122 S.W.2d 297, 299 (1938).

The admission of Richardson's statements will be upheld if they are admissible on any theory. *Spann v. State*, 448 S.W.2d 128, 130 (Tex.Cr.App.1969). In support of its finding of a continuing course of conduct, the court reasonably could believe from a preponderance of the evidence before it that appellant solicited Richardson to contact Scranton to kill another lady, subsequently revealed to be the deceased, and Scranton, although accepting the money from Richardson for that purpose, later

declined to perform, after which appellant successfully solicited Hawkins to complete the conspiracy to commit capital murder.

Given the state of the evidence and the guiding principles, the court was entitled to find the conspiracy, *i.e.*, the agreement and an overt act in furtherance thereof. The commission of the murder by Scranton was not an essential element of the conspiracy. *McCann v. State*, 606 S.W.2d 897, 898 (Tex.Cr.App.1980). Consequently, the court did not err in receiving the testimony. *Hadley v. State*, 735 S.W.2d 522, 531 (Tex. App.—Amarillo 1987, pet'n refused). Points of error ten and eleven are overruled.

▮ With her twelfth point, appellant poses the question whether the evidence is sufficient to corroborate the testimony of the accomplice witness Richardson so as to support her conviction for capital murder. She answers the question in the negative on the theory that even though the evidence creates a possible inference that might tend to connect her with the murder, all of the acts that could be inculpatory are equally capable of being innocent acts considering the relationships between all of the parties.

▮ Of course, an accused cannot be convicted on the basis of accomplice testimony unless corroborated by other evidence tending to connect the accused with the offense committed. Tex.Crim.Proc. Code Ann. art. 38.14 (Vernon 1979); *Beathard v. State*, 767 S.W.2d 423, 428 (Tex.Cr. App.1989). The test as to the sufficiency of the corroboration is to eliminate from consideration the testimony of the accomplice witness and then examine the other evidence to ascertain if it tends to connect the defendant with the commission of the offense. *Reed v. State*, 744 S.W.2d 112, 125 (Tex.Cr.App.1988). It is unnecessary that the corroboration directly link the accused to the crime or be sufficient in itself to establish guilt. *Reynolds v. State*, 489 S.W.2d 866, 872 (Tex.Cr.App.1972). In testing the sufficiency of corroboration, each case must be considered on its own facts and circumstances, *Etheredge v. State*, 542 S.W.2d 148, 150 (Tex.Cr.App. 1976), and all of the facts and circumstances in evidence may be looked to as

furnishing the necessary corroboration. *Washburn v. State*, 167 Tex.Cr.R. 125, 318 S.W.2d 627, 634 (1958), *cert. denied*, 359 U.S. 965, 79 S.Ct. 876, 3 L.Ed.2d 834 (1959).

Evidence independent of Richardson's testimony reveals that appellant, who was to, but did not, arrange for the Honeywell Company to repair the burglar alarm at the Saragusa home, told the Saragusas that Honeywell would be at the home at 4 p.m. on September 2 to repair the alarm. At that time, the deceased was seen writing "Honeywell, 4:00 p.m." Just before two o'clock in the afternoon of September 2, appellant telephoned the Saragusa home to talk with the deceased, but the call was answered by the housekeeper, who appellant was in a position to know left at three o'clock each afternoon. When informed that the deceased had left a few minutes earlier, appellant remarked that the deceased had to meet the Honeywell people at four o'clock, and she would call back later. The housekeeper left early, at about half past two.

The murder occurred shortly after 4:30 p.m. that day. The murder weapon was purchased by appellant's ex-husband, was admitted by appellant to look like the one her ex-husband had purchased for her, and was recovered by the police after it was discovered in the bedroom of and by Hawkins' live-in girlfriend, who had seen Hawkins driving appellant's automobile, a Cadillac.

A video tape showed appellant with Hawkins and Richardson at Quality Beverage on September 1. On the same day, James Lueders, Saragusa's employee, saw two black men get into appellant's Cadillac and, when he jokingly said to appellant that "somebody is over there trying to steal your car," she reminded him she had told him that some friends were coming by to take her car and sell it. Hawkins was identified by Nimer as the driver of the Cadillac bearing appellant's license plates and leaving the Saragusa driveway after Nimer heard the fatal shot. Hawkins' fingerprint was found on appellant's Cadillac and, when he was apprehended, he possessed the keys to the automobile.

Appellant was identified as the person who made reservations for a "Tony Brooks" on Continental Airlines' 8:40 p.m. flight 101 to San Francisco and requested that the ticket and invoice be sent to her. The ticket was for the August 31st flight, but at appellant's request, it was changed to the September 2nd flight. When interviewed by police, Hawkins had a Continental Airlines ticket jacket bearing his fingerprint and containing a used ticket for the September 2nd 101 flight in the name of "Tony Brooks." Discovered in appellant's purse was a heart shaped piece of paper on which was written the name "Tony Brooks" and abbreviations for Continental Airlines flight 101.

Obviously, these among other items of evidence in the record tend to connect appellant to the crime; therefore, the evidence is amply sufficient to corroborate the testimony of Richardson. The twelfth point of error is overruled.

Appellant presents a thirteenth-point contention that the intentional misconduct of the State abrogated her right to a fair trial as guaranteed by the due process clause in the Federal constitution. In accusing the State of misconduct so prejudicial that it permeated the entire trial and undermined confidence in its outcome, appellant enumerated the conduct. She charges that in response to her motion for discovery and production of evidence, the State failed to disclose (1) a video tape showing her with Hawkins and Richardson at Quality Beverage on September 1, (2) a map that the State was not allowed to place into evidence, (3) a consent form signed by Saragusa for the search of appellant's desk at Quality Beverage, (4) a copy of Honeywell's service record for the Saragusa home, (5) a report of the re-examination of the fatal bullet and the gun purchased by Beaschler with the conclusion that the fatal shot was fired from the gun, (6) its possession of a log of the detective agency watching the subdivision around the Saragusa home until the day before it was introduced into evidence, and (7) the oral statement made to the police by Nimer. She further charges the State with misconduct by its (8) failure to produce Beaschler as a witness in support of its representation of her culpa-

bility concerning the June 22nd incident, and by the prosecutor's closing argument (9) in mentioning "the shooting incident at Callaway's home," as well as (10) injecting evidence outside the record that she falsely represented her educational credentials.

■ At the outset, appellant's point of error, by encompassing ten different alleged errors, is multifarious, thereby failing to preserve error. *Euziere v. State,* 648 S.W.2d 700, 703 (Tex.Cr.App.1983). Beyond that, appellant's conceded recognition that many of the individual acts of the prosecutors, such as the admitted video tape and Honeywell's records, which were not admitted, may not constitute clear prejudicial error, is well-taken. The map did not become an evidentiary item, the consent form became a defense exhibit, and no objection was lodged when the expert expressed his conclusion about the murder weapon to the jury. Tex.R.App.P. 52(a). The previous decisions adverse to appellant's third- and ninth-point contentions forecloses the attempt here to resurrect the respective matters of Beaschler's non-appearance as a witness and Nimer's oral statement as reversible misconduct. And the court's prompt instructions to the jury to disregard the prosecutor's two improper arguments were sufficient to cure any harm to appellant. *McKay v. State,* 707 S.W.2d 23, 37 (Tex.Cr.App.1985), *cert. denied,* 479 U.S. 871, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986).

Thus, it cannot be said that the prosecutors' complained of conduct so permeated the entire trial so as to violate appellant's due process rights. *United States v. Lowenberg,* 853 F.2d 295, 304 (5th Cir.1988), *cert. denied,* 489 U.S. 1032, 109 S.Ct. 1170, 103 L.Ed.2d 228 (1989). The thirteenth point of error is overruled.

With her fourteenth point, appellant claims that her right to counsel guaranteed by the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution, and Article I, sections 10 and 19 of the Texas Constitution, was abrogated by the State's suppression of *Brady* material, its intentional disregard of the trial court's instructions, and its investigation of de-

fense attorneys and investigators, which undermined her attorneys' abilities to investigate the facts, prepare a defense, and conduct effective cross-examination of witnesses. Specifically, she complains that the prosecutors failed to mention that Scranton's statement and Richardson's testimony were in conflict with each other, represented on March 3 that no deals had been made with Scranton, and interfered with the attorney-client relationship by investigating her attorneys and their investigators.

■ Again, the point is too multifarious to present error. In addition, these same contentions were introduced in appellant's points of error one, four, five, six, seven, and eight, the overruling of which denied reversible error. Although appellant raises the specter of ineffective assistance of counsel resulting from the State's conduct, the suggestion is not firmly founded, for she has not shown the harm required by *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and *Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex.Cr.App.1986), to secure relief for that reason. Moreover, appellant's constitutional right to be confronted by the witnesses against her is not a constitutionally compelled rule of discovery; the ability to question witnesses does not include the power to force pretrial disclosure of all information that might be helpful in contradicting unfavorable testimony. *Pennsylvania v. Ritchie*, 480 U.S. 39, 52–53, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). The fourteenth point of error is overruled.

Points of error fifteen, sixteen, seventeen, and eighteen are a combination of appellant's basic contentions that her arrest and custodial interrogation were in violation of the Fourth, Fifth, and Sixth Amendments of the United States Constitution and Article I, sections 9, 10, and 19 of the Texas Constitution, by virtue of which the trial court erred in overruling her motions to suppress evidence and statements obtained as a result thereof. Attempted to be suppressed were all of her oral statements made to the Houston police on September 2 and 3, her written statement of September 3, and the evidence seized pursuant to her signed consent to search forms. A review of the testimony adduced at the suppression hearing is necessary.

The murder of the deceased was discovered at approximately 5 p.m. on September 2. After the police were called to the murder scene, Lieutenant R.W. Holland assigned homicide investigators Waymen Allen, Russell Dunlap, James Ramsey, and W.I. Stephens to investigate various aspects of the case. Saragusa, who was notified at his office of the event, Reed, and appellant arrived at the Saragusa home.

Officers Dunlap and Allen talked to appellant shortly after 6:30 p.m. Appellant told Allen that she had received a threatening phone call from an unknown white male, who asked, "Is this Jane?" and stated, "You will pay." When questioned about a 4:00 p.m. appointment Saragusa said she made with a security company to work on the alarm system at the house that day, appellant told Dunlap that someone had called and canceled the appointment. Allen informed Stephens about the threatening phone call, and that he had learned a vehicle registered to appellant was parked at the deceased's home and a black male was seen speeding away in it shortly after a shot was fired.

Allen and Stephens asked appellant if she would go to the police department, Stephens telling her they wanted to interview her about the phone call and other events that might help the investigation. Appellant voluntarily agreed and, at about 8:35 p.m., Stephens and Ramsey transported her and Mike Reed, whom she had requested to accompany her, to the police department.

Appellant was taken to a work room in the homicide division and offered an opportunity to eat and drink, but she declined. The initial phase of the interview began at about 8:50 p.m. after Officers Stephens and Ramsey had removed their weapons, and continued until approximately 10:30 p.m., with Stephens doing most of the interviewing. Although Appellant was not told she was the subject of the investigation or free to leave, she was, both Stephens and Ramsey agreed, free to leave at any time. She

indicated she wanted to help in any way she could.

Stephens initially interviewed appellant about the Saragusas and her employment at Quality Beverage. Later, they talked about the phone call, asked her about her car, and the appointment with the security company.

Appellant told Stephens that she had loaned her Cadillac, which she last observed at the Quality Beverage parking lot, to her cousin, Beth Hendrix, who resided in Lubbock. Stephens telephoned Hendrix in the presence of appellant, who heard the conversation in which, it was developed at trial, Hendrix's statement conflicted with appellant's. When confronted with the information that her vehicle had been seen around the Saragusa neighborhood, parked in front of the Saragusa home, and leaving the home while being driven by a black male, she said she had no idea who might be driving it. Asked if any black males had ever driven her car, she replied one named Joe Franklin, who was deceased.

Asked if she knew any other black males, she named J.R. Morton and Michael Richardson. Requested to describe Richardson, appellant gave a description that was similar to the description of Hawkins given by Nimer.

At 10:30 p.m., appellant was asked if she was thirsty or hungry, and she requested a diet cola, which was provided. The interview continued, albeit Stephens and Ramsey each left the room at different times to converse with Allen, Dunlap, and Holland. Stephens, learning from Allen and Dunlap that contrary to the information appellant had given, Honeywell had no work order or cancellation of it on September 2 for the Saragusa home, and appellant and Saragusa had been lovers, as well as information concerning an interview with the Saragusa maid, confronted appellant with several inconsistencies in her statements. She then stated that she knew that things didn't sound right, did not understand why they couldn't believe her, and, "I want to stay here and talk as long as it takes to clear this thing up." Although Stephens did not

tell appellant so, he said that she still was free to leave.

Learning that an employee of Quality Beverage reported that appellant had made arrangements for two males to pick up her car, Ramsey's suspicion of her increased. Questioned by Stephens, who did not remember what she said about the males, appellant said she did not know anything about the murder, and that she had no idea who was driving her car if, in fact, her car was the one seen at the residence.

The prosecutor was called and arrived about midnight, when Stephens advised him of the information received. At approximately 12:20 a.m. the next morning, September 3, Stephens requested appellant to sign, and she signed, forms consenting to searches of her home and her desk at the office. Allen searched appellant's desk at Quality Beverage at 1 a.m., and Holland searched her house at about 2:30 a.m., seizing several items.

While other officers were securing statements from various witnesses, verifying the statements they had received, and obtaining physical evidence, Stephens continued to talk with the prosecutor, discussing whether there was sufficient evidence to charge appellant. Afterwards, at 12:40 a.m., Stephens, acting upon the advice of the prosecutor, gave appellant the *Miranda* [6] warnings.

According to the officers, appellant was free to leave until the *Miranda* warnings were given, but not thereafter. However, all of the officers, except possibly one, admitted that they did not tell her she was free to leave. Stephens believed that before midnight, appellant was told she could leave. All of the officers conceded that they did not tell her she could use the phone, did not tell her she was a suspect, did not tell her that she was to be charged with capital murder, and that they learned no new information between midnight and her arrest. It was Stephens' observation that appellant was very unemotional, cooperative, educated, articulate, and was speaking freely, answering anything asked. On a number of occasions in the interview,

6. *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

appellant reported that she wanted to stay and clear up the situation, even after she had been advised of her statutory rights and was not free to leave.

At approximately 4:00 a.m., appellant was handcuffed and being taken toward the booking room when she stated that she wanted to level with the officers about her car and Richardson. Stephens again advised appellant of her rights and began copying her statement at 4:20 a.m. At about 5:45 a.m., she initialed the warnings contained at the beginning of the statement and signed the statement.

At the conclusion of the hearing, the court found nothing in the record to suggest that appellant was in custody until she was arrested at 12:40 a.m. on September 3. The court then found that the oral statements made prior to her arrest were noncustodial, the consent to search forms were voluntarily signed, the evidence obtained by the police was not the result of an illegal seizure and was admissible, and her written statement was made after she was properly warned.

 Against this background, appellant asserts that once she was the focus of the police investigation and "tricked" into accompanying police to the homicide office for questioning, she was in custody and entitled to all of her constitutional rights, which required the suppression of her oral statements, her written statement, and all evidence obtained as a result of the consent forms. Still, the contrary findings by the trial court, the sole trier of fact at the hearing on appellant's motions to suppress, *Green v. State,* 615 S.W.2d 700, 707 (Tex. Cr.App.1980), *cert. denied,* 454 U.S. 952, 102 S.Ct. 490, 70 L.Ed.2d 258 (1981), are not to be disturbed absent a clear abuse of discretion. *Dancy v. State,* 728 S.W.2d 772, 777 (Tex.Cr.App.), *cert. denied,* 484 U.S. 975, 108 S.Ct. 485, 98 L.Ed.2d 484 (1987). The evidence adduced at the hearing on the motions, the only evidence considered, *Hardesty v. State,* 667 S.W.2d 130, 133 n. 6 (Tex.Cr.App.1984), negates an abuse of discretion because it supports the court's findings, thereby requiring that they be upheld. *Green v. State,* 615 S.W.2d at 707.

 A person is under arrest when he has been actually taken into custody or placed under arrest. Tex.Crim.Proc.Code Ann. art. 15.22 (Vernon 1977). An arrest is complete when a person's liberty or movement is restricted or restrained; but a person is "seized" within the meaning of the Fourth Amendment to the United States Constitution only if, in view of all the surrounding circumstances, a reasonable person would have believed he was not free to leave. *Livingston v. State,* 739 S.W.2d 311, 327 (Tex.Cr.App.1987), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988).

 At the time appellant was requested to go to the police department for an interview to assist in the investigation, the police were conducting a general investigation into an unsolved murder. Law enforcement officers are not precluded from asking someone to voluntarily accompany them, or of providing transportation, to the police station or some other proper place to further an investigation of a crime. The person is, of course, free to refuse such a request. Thus, where it is shown that the transportee is acting solely upon an invitation, request, or even the urging of the police, and there are no threats, express or implied, that the person will be taken by force, the accompaniment is voluntary and the person is not in custody. Under these circumstances, such a person has not been deprived of his freedom of movement in any meaningful way. *Shiflet v. State,* 732 S.W.2d 622, 628 (Tex.Cr.App.1985). Even when a person, who knows that investigating officers suspect that he may be implicated or may have committed a crime, voluntarily accompanies the officers, the person is not in custody or restrained so that his rights granted by the Fourth Amendment to the United States Constitution and by Article I, section 9 of the Texas Constitution are implicated. *Livingston v. State,* 739 S.W.2d at 327.

When appellant agreed to go to the police department, she was not the focus of the investigation, and the officers did not know where the information to be obtained would lead them. When she arrived at the

police department, she was offered food and drink and was not subjected to any of the normal procedures associated with an arrest. Indeed, there is testimony that she was free to leave the police department any time before 12:40 a.m., and perhaps told by Stephens that she was free to leave. Several officers were investigating to verify information appellant provided and, when informed that her statements were inconsistent with information obtained by investigating officers, she repeatedly expressed the desire to remain there as long as it took to clear things up. Her reiterated expression of assistance suggests that she knew she was free to leave. It was when the officers compared and gave their information to the prosecutor sometime after midnight that appellant was arrested.

Then, given the totality of the circumstances, the trial court did not abuse its discretion in finding that appellant was not under arrest until approximately 12:40 a.m. on September 3, and in overruling the motions to suppress. *Dancy v. State*, 728 S.W.2d at 779. Points of error fifteen through eighteen are overruled.

In points nineteen and twenty, appellant contends that she was denied due process, and due course of law as guaranteed by Article I, section 19 of the Texas Constitution, by the systematic exclusion of Hispanics from the jury panel. This resulted, she claims, because the district clerk intentionally deviated from the standard procedures used in Potter County to select jury panels, thereby depriving her of her right to a jury selected from a cross-section of the community.

After the transfer of this cause from Harris County to Potter County for trial, selection of a jury began on April 6, 1988 from the names of persons on the current voter registration lists, who were not exempt from jury service, as drawn from the jury wheel. Tex. Gov't Code Ann. §§ 62.-001, 62.004 (Vernon 1988). On May 4, following the voir dire of 150 prospective jurors, a defense counsel listed five of them as Hispanic and eight of them as Black. He reviewed the next twenty-seven names and listed only one as Hispanic. Appellant then moved to quash the venire and dismiss the jurors previously selected because of the systematic exclusion of Hispanics.

At the hearing on the motion, an expert in the area of statistical analysis and analysis of voting data testified that although a differential between census and voter registration figures is usual with respect to Hispanics, the differential of 4.9% between 1980 Potter County census figures and voter registration figures for Hispanics would not ordinarily occur by chance. Therefore, he concluded, a systematic underrepresentation and exclusion of Hispanics on venires occurred because of the use of the registered voter list in Potter County. The State countered with the testimony of the veteran supervisor of the Potter County jury room, who said that a computer randomly selected a specified number of names by voter registration numbers from the semi-annually updated jury wheel to be summoned to serve on jury duty, which is a system constitutionally sanctioned. *United States v. Arlt*, 567 F.2d 1295, 1297 (5th Cir.), *cert. denied*, 436 U.S. 911, 98 S.Ct. 2250, 56 L.Ed.2d 412 (1978); *Shelby v. State*, 479 S.W.2d 31, 40 (1972); *Garcia v. Texas Emp. Ins. Ass'n*, 622 S.W.2d 626, 630 (Tex.App.—Amarillo 1981, writ ref'd n.r.e.). She added that under the computerized system, it was impossible to exclude any groups in the selection of the venire.

The court denied the quashal motion. Unsuccessfully, appellant reurged the matter in her motion for new trial, attempting to show by the expert that because the special venire selected by the computer for this trial did not include resummoned prospective jurors, *i.e.*, those who did not originally appear and, at a later appearance, were commingled with those first summoned for regular jury venires, underrepresentation of Hispanics resulted.

■ Appellant's motion came too late for consideration. The Texas Code of Criminal Procedure unambiguously requires a challenge to the array to be made before the panel is qualified. Tex.Crim. Proc.Code Ann. art. 35.06 (Vernon 1989). Thus, by waiting until mid-voir dire to challenge the array, appellant waived her opportunity for challenge. *Jackson v. State*,

745 S.W.2d 4, 18 (Tex.Cr.App.), *cert. denied,* 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 947 (1988); *Esquivel v. State,* 595 S.W.2d 516, 523 (Tex.Cr.App.), *cert. denied,* 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980).

 In addition, noncompliance with the mode and manner of summoning the venire set out in section 62.001, *supra,* constitutes error only when defendant establishes harm, *i.e.,* showing that the noncompliance compromised the fairness of the trial. *Lewis v. State,* 815 S.W.2d 560, at 563–564 (Tex.Cr.App.1991). Appellant has not demonstrated harm, for she does not contend that the selection procedure forced her to accept an objectionable juror or denied her an impartial jury. *Jackson v. State,* 745 S.W.2d at 18. Points of error nineteen and twenty are overruled.

 Appellant employs her last point of error to contend that she was denied equal protection by the State's arbitrary decision to selectively prosecute her for capital murder when other persons similarly situated were prosecuted only for murder. Prior to trial, she had moved to dismiss the capital murder prosecution on that ground, but the court, deferring to the prosecutor's discretion, overruled the motion.

 Appellant recognizes that the State exercises broad discretion to determine the extent of prosecution, *United States v. Goodwin,* 457 U.S. 368, 382, 102 S.Ct. 2485, 2493, 73 L.Ed.2d 74 (1982), thereby allowing prosecution under any statute violated so long as it does not discriminate against any class of defendants. *Wayte v. United States,* 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985). Yet, since the prosecutor's discretion is not unrestrained, *id,* appellant sought to sustain her contention by establishing, pursuant to *United States v. Berrios,* 501 F.2d 1207, 1211 (2nd Cir.1974), that she was selectively discriminated against by being prosecuted for capital murder when others similarly situated were prosecuted only for murder.

In the effort to support her defense of selective prosecution, appellant adduced testimony concerning the district attorney's prosecution of persons in Harris County for murder rather than for capital murder. One woman hired a man to kill her husband for $25,000, and both were charged with murder, not capital murder.

Another woman, who promised her male co-defendant proceeds from her inheritance for killing her parents, was prosecuted for murder. The State showed that the woman was charged with capital murder, but the grand jury returned a no bill, after which she was indicted for murder when her male co-defendant, who was being prosecuted for capital murder, agreed to, and did, testify against her in exchange for a life sentence for murder. It was the State's theory that it would be basically unfair to try the woman for capital murder and seek the death penalty when the triggerman received only a life sentence.

In another prosecution, both a male, who was to receive money from the wife of the deceased he killed, once the insurance proceeds were paid, and the widow were charged with conspiracy to commit capital murder, although both are charged with capital murder in another county where the body was found. The State further developed the testimony to show that the district attorney filed the case as capital murder, but the grand jury's indictment was for conspiracy.

Another woman defendant in a murder-for-hire case was indicted for capital murder, but later re-indicted for murder. The prosecutor explained that the re-indictment resulted when, among other things, the police investigation revealed that the defendant had been harmed by the complainant over a long period of years, a circumstance not present in the instant prosecution.

When the defense's evidence was presented, the State evidenced that two women, who actually committed murder, were tried for capital murder and received the death penalty. One other woman who did not commit the murder was tried for capital murder, but did not receive the death penalty. In Harris County, the district attorney ultimately decides whether a person accused of criminal homicide is prosecuted for murder or capital murder.

835

In view of the discretion accorded the district attorney as to whom to prosecute on what charges, appellant was required to show that the prosecutorial system had a discriminatory effect and that it was motivated by a discriminatory purpose. *Wayte v. United States,* 470 U.S. at 608, 105 S.Ct. at 1531. But the most that this record shows is that some women accused of criminal homicide were charged with capital murder and some were charged with murder. Appellant has not shown that the unequal application of the murder statutes is intentional or purposeful discrimination. *Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944). Therefore, she has not sustained her contention. *Satterwhite v. State,* 726 S.W.2d 81, 84 (Tex. Cr.App.1986), *rev'd on other grounds,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988). Her twenty-first point of error is overruled.

Accordingly, the judgment is affirmed.